UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 05-440 |
| ALTON COLES, ET AL. | : | |

**SURRICK, J.**                                                    **OCTOBER 4, 2007**

### MEMORANDUM & ORDER

Presently before the Court are Defendant Alton Coles' Motion To Suppress Evidence

Obtained From The Interception Of Wire Communications (Doc. No. 304), Defendant Hakiem

Johnson's Motion To Suppress All Intercepted Wire Communications (Doc. No. 299), and

Defendant Monique Pullins' Motion to Suppress All Intercepted Wire Communications (Doc.

No. 311).[1]  The Suppression Hearing regarding intercepted wire communications was held on

August 13, 2007.  For the following reasons, Defendants' Motions will be denied.

**I.      BACKGROUND**

---

[1]The following defendants did not file separate motions to suppress the Title III interceptions, but were granted leave to join in the pre-trial motions of the co-defendants: Keenan Brown (Doc. No. 266), Dante Tucker (Doc. No. 391), Tyrek McGeth (Doc. No. 420), Desmond Faison (Doc. No. 425), James Morris (Doc. No. 441), Robert Cooper (Doc. No. 458), Timothy Baukman (Doc. No. 462), and Antonio Lamont Jackson (Doc. No. 484).  In addition, Brown filed a Motion to Join in Co-Defendant's Motion to Suppress Title III Wiretaps.  (Doc. No. 508.)  Terry Walker also filed motions to join in the pre-trial motions of his co-defendants (*see* Doc. Nos. 269, 389), but conceded at the August 13, 2007 Suppression Hearing that he did not have standing to contest the wiretap interceptions because he was not on any of the tapes (Suppression Hr'g Tr. 25, August 13, 2007).  Thais Thompson originally moved to join in her co-defendants' motions (Doc. No. 454), but later filed a motion to vacate that motion (Doc. No. 471).

On February 21, 2007, the grand jury returned a Fifth Superseding Indictment ("indictment") charging Defendant Alton Coles and twenty-one co-defendants with offenses related to their participation in a wide-ranging drug conspiracy.

On May 19, 2005, in furtherance of an investigation of the alleged drug activities of Defendant Alton Coles and his co-conspirators, the Government submitted an initial application for authorization of a wiretap of Defendant Coles' cellular phone at number 267-784-3964. (Doc. No. 483 at 2.)  Attached to the application was Special Agent Anthony M. Tropea's Affidavit In Support Of Application For The Interception of Wire Communications ("Tropea Affidavit"), which detailed Agent Tropea's professional background, provided facts gathered during the investigation that Agent Tropea deemed relevant to the Title III application, and explained the Government's need for wiretap approval.  (Doc. No. 483 at 2; *see* Tropea Aff.) The Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, authorized the wiretap on May 19, 2005, to end in thirty (30) days.  (Doc. No. 483 at 2.)  The Government submitted ten-day reports regarding the progress of the wiretap for the duration of the wiretap's authorization.  (*Id*. at 14.)

On June 20, 2005, the Government submitted an application to renew the initial wiretap authorization for a second thirty (30) day period.  (*Id*. at 2.)  Special Agent Michael T. Ricko's Affidavit In Support Of Application For The Continued Interception of Wire Communications ("Ricko Affidavit") accompanied this application, which Judge Robreno approved.  (Doc. No. 483 at 2; *see* Ricko Aff.)  The Government repeated this process with a second renewal application, accompanied by an affidavit from Agent Tropea, on July 20, 2005.  (Doc. No. 483 at 2.)

Beginning on July 1, 2005, the Government also sought an order authorizing interception of oral communications over cellular phone number 302-466-7092. (*Id*. at 3.) Judge Robreno entered an order granting the request that same day and also authorized a first renewal of the wiretap on August 1, 2005. (*Id*.)

Upon Defendant Coles' arrest on August 10, 2005, all interceptions ended.[2] (*Id*.)

## II.    LEGAL ANALYSIS

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522 (2000) ("Title III"), governs the authorization and conduct of electronic surveillance, including wiretaps. In enacting Title III, Congress sought to balance the dual interests of protecting individual privacy rights and empowering law enforcement to combat organized crime. *See United States v. Kahn*, 415 U.S. 143, 151 (1974). As the Supreme Court instructed in *Kahn*, this "tension" must be resolved by reference to the "precise wording" of Title III. 415 U.S. at 151.

Pursuant to Title III, a wiretap application must satisfy a number of requirements:

(1) Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon

---

[2]The Fifth Superceding Indictment, which contains 194 counts, charges the various defendants with a number of different crimes. Those crimes include, *inter alia*, conspiracy to distribute 5 kilograms or more of cocaine and 50 grams or more of cocaine base in violation of 21 U.S.C. § 846; distribution and possession with intent to distribute cocaine or cocaine base in violation of 21 U.S.C. § 841(a)(1); use of a communication facility to facilitate the distribution of cocaine or cocaine base in violation of 21 U.S.C. § 843(b); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c); carrying a firearm during and relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c); possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1); money laundering conspiracy in violation of 18 U.S.C. § 1956(h); money laundering with intent to promote drug trafficking in violation of 18 U.S.C. § 1956(a)(1)(A)(I); and money laundering with intent to conceal or disguise proceeds of drug trafficking in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such an application. Each application shall include the following information:

(a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) a statement of the period of time from which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

(e) a full and complete statement of the facts concerning all pervious applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application; and

(f) where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

18 U.S.C. § 2518(1).

Upon receiving a complete application, a judge may issue an *ex parte* order authorizing

the wiretap:

if the judge determines on the basis of the facts submitted by the applicant that -

(a) there is probable cause for believe that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3).

Defendants move to suppress the evidence obtained through the Government's wiretaps on the grounds that in its application the Government failed to satisfy the statutory "necessity" requirement of § 2518(1)(c) that conventional investigatory techniques appear unlikely to succeed if tried or to be too dangerous.  (Doc. No. 304 at 4; Doc. No. 299 at 6; Doc. No. 311 at 4).  In the alternative, Defendant Johnson seeks an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), on the grounds that the Government intentionally withheld information from its wiretap affidavit.  (Doc. No. 521 at unnumbered 2.)  In addition, several Defendants challenge the wiretaps on minimization grounds, claiming that the Government failed to adequately minimize its intrusion as required by § 2518(5) of Title III.  (Doc. No. 299 at 8; Doc. No. 311 at 8).[3]

---

[3] Defendants conceded probable cause in the wiretap affidavit.  (*See* Suppression Hr'g Tr. 30, August 13, 2007.)

**A.    Necessity**

Defendants contend that the Court should suppress evidence obtained through wiretaps because the Government did not make the requisite showing of "necessity." (Doc. No. 304 at 4; Doc. No. 299 at 6; Doc. No. 311 at 4). Defendants argue that the Government affidavits failed to fulfill the requirements, articulated in Title III, §§ 2518(1)(c) and (3)(c), to make a showing that electronic interceptions were necessary because other investigatory procedures had failed or were likely to fail. (Doc. No. 304 at 4; Doc. No. 299 at 6; Doc. No. 311 at 4).

As recited above, an application for an order authorizing or approving a Title III wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). A judge may grant such an order after determining, among other things, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).

The Supreme Court has determined that the language of §§ 2518(1)(c) and (3)(c) "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Kahn*, 415 U.S. at 153 n.12. The application procedures of Title III are designed to "make doubly sure that the statutory authority [is] used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications." *United States v. Giordano*, 416 U.S. 505, 515 (1974). The requirements of §§ 2518(1)(c) and (3)(c) in particular prevent electronic surveillance from being "routinely employed as the initial step in criminal investigation." *Id*.

The Court of Appeals for the Third Circuit has had the opportunity to discuss the "necessity" requirement of Title III on a number of occasions.  A review of several of the Third Circuit decisions and the principles derived therefrom is instructive.

To satisfy the so-called "necessity" requirement in the Third Circuit, a "factual predicate" must exist in the government's affidavit "to support a finding that normal investigative procedures are unlikely to be successful." *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir. 1975); *see also United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997) (finding that "the government need only lay a 'factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient.") (quoting *United States v. McGlory*, 968 F.2d 309, 345 (3d Cir. 1992) (internal quotation marks omitted).  Under this "pragmatic" approach, "the government's showing is to be tested in a practical and commonsense fashion." *United States v. Vento*, 533 F.2d 838, 849 (3d Cir. 1976) (internal quotation marks omitted).  Therefore, "the government need not prove to a certainty that normal investigative techniques will not succeed but rather need only show that such techniques reasonably appear to be unlikely to succeed if tried." *Armocida*, 515 F.2d at 38 (internal quotation marks omitted).

In addition, the government need not exhaust conventional investigative techniques prior to applying for a Title III wiretap.  *See, e.g., Vento*, 533 F.2d at 849.  Even though traditional investigatory techniques may be sufficient to gather evidence of some crimes, "[i]nvestigations are not restricted to crimes which can be probed satisfactorily by normal methods.  In the proper circumstances, the instrumentalities of Title III may be employed to discover the full extent of crimes and conspiracies." *Vento*, 533 F.2d at 850.  *See also Armocida*, 515 F.2d at 38 (finding that "[a]lthough the government has actual knowledge of a conspiracy and evidence sufficient to

prosecute one of the conspirators, it is unrealistic to require the termination of an investigation before the entire scope of the narcotics distribution network is uncovered and the identity of its participants learned."). Because of the "special dangers" they pose, "the government is entitled to more leeway in its investigative methods when it pursues a conspiracy." *United States v. McGuire*, 307 F.3d 1192, 1198 (9th Cir. 2002) (upholding district court's necessity finding where traditional, less intrusive techniques were sufficient to prosecute "the main conspirators, but not . . . other satellite conspirators." (quoting *United States v. Torres*, 908 F.2d 1417, 1422 (9th Cir.1990)).

In making the "necessity" determination, the court "may properly take into account affirmations which are founded in part upon the experience of specially trained agents." *Williams*, 124 F.3d at 418. However, "boilerplate" language and conclusory statements are not sufficient. *Vento*, 533 F.2d at 849. When the government asserts that a wiretap is necessary because normal investigative procedures are unlikely to succeed, "[t]he government must . . . fully explain to the authorizing judge the basis for such a conclusion." *Id*.

In *Armocida*, the Third Circuit found that the government's wiretap application satisfied §§ 2518(1)(c) and (3)(c) of Title III where the affidavit demonstrated that conventional investigatory techniques "failed to determine the scope of the conspiracy and to identify the participants." 515 F.2d at 38. The affidavit described the investigative procedures that the government had already tried: "physical surveillance; utilization of informants; undercover agents; and other wiretap interceptions." *Id*. The government further highlighted the insufficiency of conventional techniques by explaining that its informant had refused to testify, that surveillance would be detected, and that search warrants would not reveal the information

desired.  *Id*.  The affidavit explained that rather than reveal the scope of the conspiracy, conventional investigatory techniques had merely identified one defendant as a "'street-level' distributor." *Id*.  Under the circumstances, the court concluded that the affidavit satisfactorily demonstrated that normal investigative techniques were insufficient.  *Id*.

In *Vento*, the Third Circuit again explored the Title III requirements for wiretap applications and found that "the government made an adequate showing that other methods were unlikely to succeed" by demonstrating in the affidavit that (1) anonymous informers refused to testify and (2) prolonged physical surveillance would have been detected because of the defendant's reputed suspiciousness.  533 F.2d at 850.  Furthermore, the court found that the government did not need to explain its decision not to infiltrate the conspiracy with an undercover agent.  *Id*.  The court observed that the defendants, in arguing that the government's investigation should be limited to conventional investigatory methodology, took "an unreasonably narrow view of the scope of this investigation." *Id*.  As in *Armocida*, the court recognized the broad scope of the investigation, which was intended "to show the scope of the conspiracy [and] the nature of [defendant's] on-going criminal activity." *Id*.  Since the government had demonstrated that it could not "discover the full extent of crimes and conspiracies" with resort only to conventional investigatory techniques, the court found that the government's affidavit satisfied the § 2518 application requirements.  *Id*.

More recently, in *Williams* the Third Circuit noted that in cases examining § 2518(3)(c), generally the government prevailed on the necessity issue

> by demonstrating such factors as the inability of a confidential informant to gather additional information, the futility of electronic oral surveillance where the crime was being committed in silence, the use of evasive tactics by the investigation's targets, and the difficulty of penetrating an organization with a secretive nature and

a propensity towards violence.

124 F.3d at 418.  The *Williams* court found the "necessity" requirements satisfied where the

government detailed how further use of conventional techniques would result in the discovery of

the investigation by defendants.[4]  *Id*. at 419.  The wiretap affidavit stated that the organization

being investigated was "highly suspicious of unfamiliar persons," making confidential

informants difficult to place; that previous confidential informants and physical surveillance had

been exploited to their fullest extent; and that "the organization transacted its business in private

and via cellular phones, making it difficult to investigate the organization and learn the identities

of upper echelon figures." *Id*.  The court concluded that, read in a "practical and commonsense

fashion," the affidavit "sufficiently showed the need for video surveillance."[5] *Id*.

In the instant case, Coles claims that Agent Tropea's affidavit for the initial wiretap

"indicates law enforcement successfully used conventional investigatory procedures in the

course of the present investigation." (Doc. No. 304 at 2.)  Coles points to the reliable and

---

[4]In 2005, in *United States v. Lewis*, 139 Fed.Appx. 455, 458 (3d Cir. 2005), a non-precedential opinion, the Third Circuit found that an affidavit with "six pages of detailed information regarding the insufficiency of traditional investigative procedures" satisfied § 2518(3)(c).  139 Fed.Appx. at 458.  The affidavit, containing information gathered during a two-year investigation, detailed the limited usefulness of physical surveillance because of "lookouts," who had "attacked an FBI surveillance van." *Id*.  Furthermore, the informants could not speak to the defendant about the operation's scope "without raising suspicion." *Id*.  Finally, prior to testifying before a grand jury about the defendant, a government witness was killed.  *Id*.  The *Lewis* court noted that although the government possessed some "critical information" about the defendant's drug activities, "'it is unrealistic to require the termination of an investigation before the entire scope of the narcotics distribution network is uncovered and the identity of its participants learned.'" *Id*. (quoting *Armocida*, 515 F.2d at 38).

[5]The *Williams* court examined Title III in the context of the government's application for an order authorizing video surveillance.  *Williams*, 124 F.3d at 414, 418.  The court found the normal Title III standards and case law to be equally applicable to a video surveillance application.  *Id*. at 417, 418.

corroborated first-hand information gathered from confidential sources, particularly CS-1, CS-2, and CS-4, listed in the affidavit.  (*Id*. at 2, 3.)  Coles notes that, according to the affidavit, CS-1 observed Coles' drug activity, knew of his money-laundering methods and his "front" business, and could identify his associates in Take Down Records, the front business.  (*Id*. at 2.) CS-2 provided information "relating to Coles and his co-conspirators." (*Id*. at 3.) CS-4 informed the Government about the "'drug relationship' between Alton Coles and [co-defendant] Charleton Custis." (*Id*. at 3.)

Coles argues that this evidence, including first-hand evidence of his criminal drug activities, belies Agent Tropea's conclusion that a wiretap is the "'only available technique that has a reasonable chance of securing evidence necessary to establish COLES' involvement in the sale and distribution of cocaine and crack cocaine.'" (*Id*. at 3 (quoting Tropea Aff. ¶ 72).)  Coles labels such a conclusion "boilerplate," because it appears in identical form in Special Agent Ricko's affidavit.  (*Id*. at 7 (citing Ricko Aff. ¶ 44).)  Coles argues that Agent Ricko's affidavit is in fact a "confirmation that law enforcement personnel successfully used conventional investigatory procedures and that a wiretap was unnecessary." (*Id*. at 4.)  He notes the addition in Agent Ricko's affidavit of a confidential source, CS-5, whose first-hand information about the drug conspiracy was also corroborated.  (*Id*. at 4.)  Finally, Coles argues that Agent Ricko's conclusion about the necessity of a wiretap is contradicted by the affidavit "indicating Mr. Coles [sic] alleged drug organization had been thoroughly infiltrated by confidential informants with first hand knowledge."[6] (*Id*. at 7.)

---

[6]The motions of Defendants Johnson and Pullins, which are identical except for numbering and a few sentences, make no reference to the particular facts of this case, nor to either affidavit at issue.  They do refer to "[t]he generic language in the instant affidavit(s)" (Doc. No. 311 at 7; *see also* Doc. No. 299 at 7), but without citation to the affidavits of Agents

In its consolidated response, the Government refers to the detailed information in Agent Tropea's "necessity" section, as well as the detailed information in the rest of the affidavit. (Doc. No. 483 at 6, 7.)  The Government challenges Defendants' description of the affidavit as contradictory.  (*Id*. at 7.)  It explains that, as documented in the affidavit, the confidential sources could not "interact with [Coles] personally and approach him while electronically monitored or supervised by law enforcement." (*Id*. (quoting Tropea Aff.¶ 74).)  The Government further notes that CS-1 was not cooperating with the Government at the time of the affidavit and that CS-2 did not have direct contact with Coles.  (*Id*.)  In addition, the Government quotes from Agent Ricko's affidavit, which concludes that, while useful, the confidential sources "'cannot provide investigators with a comprehensive accounting of all the current members of COLES' organization, all the related suspect locations and all assets and proceeds that can be seized for forfeiture." (*Id*. at 8 (citing Ricko Aff. ¶ 49).)

After reviewing the affidavit of Agent Tropea and the affidavit of Agent Ricko, we are satisfied that the Government provided a "full and complete statement" describing why "other investigative procedures" were insufficient.  Turning first to Special Agent Tropea's 63-page affidavit, we note that contrary to the Defendants' assertions that the affidavit contains "boilerplate" language and "conclusory" statements, Agent Tropea's conclusions are fully supported by detailed facts, examples, and analysis.

In his affidavit, Agent Tropea documents the goal of the wiretap (Tropea Aff. ¶ 6, 72); the conventional investigative techniques employed during the investigation (*Id*. ¶ 73); the limited usefulness of conventional techniques such as trash pulls and examination of telephone

---

Tropea and Ricko.  They also make reference to the treatment of electronic surveillance under the laws of the State of Nevada.

records (*Id*. ¶ 84); and the obstacles to mobile and fixed physical surveillance (*Id*. ¶¶ 76, 79). In addition, the Tropea Affidavit explains how conventional investigatory methods risk alerting investigation targets to existence of an investigation. (*Id*. ¶¶ 73, 76, 79, 82, 83, 85.) The Tropea Affidavit describes how Coles is wary of surveillance (*Id*. ¶¶ 76, 78, 81) and takes counter-surveillance measures to avoid detection and hamper investigators (*Id*. ¶¶ 77, 78, 80, 81). Agent Tropea explains that were Coles to be alerted to the ongoing investigation, it would make "further covert investigation impossible." (*Id*. ¶ 85.)

Agent Tropea addresses the use and limits of other investigatory techniques in his affidavit. He explains that a federal grand jury would not be helpful because the coconspirators can not be approached without revealing the investigation to the targets and that they were unlikely to testify voluntarily. (*Id*. ¶ 82.) He notes that search warrants can not be employed because of problems establishing probable cause, difficulty identifying locations used by the Defendants for criminal activity, and the risk of disclosing the ongoing investigation to Defendants. (*Id*. ¶ 83.) Arresting coconspirators would similarly alert Coles to the federal scrutiny. (*Id*. ¶ 85.)

Contradicting Defendants' arguments that the Government's confidential sources provided sufficient information about the criminal organization, the Tropea Affidavit explains the limited usefulness of the confidential sources in the context of the investigation. (*Id*. ¶¶ 74, 75.) Agent Tropea notes that the confidential sources generally cannot interact with Coles personally (*Id*. ¶ 74), cannot approach him while electronically monitored (*Id*. ¶ 74), cannot reveal the true scope of the organization and conspiracy (*Id*. ¶ 82), and can only provide after-the-fact information (*Id*. ¶¶ 74, 75). The Tropea Affidavit demonstrates how, even with the

significant amount of intelligence gathered on Coles and his organization, the Government is unable to procure information about the full scope of the conspiracy, the identities of all participants, or the locations where criminal activity took place. (*See Id*. ¶ 72.)

The Ricko Affidavit was used only to seek a renewal of the wiretap. Nevertheless, the Ricko Affidavit also fulfills the Title III requirement of explaining the insufficiency of normal investigative techniques before resort to a wiretap is permitted. In addition to providing a background of the case and information gathered from the confidential informants, the Ricko Affidavit includes a "Wiretap Interception Information" section (Ricko Aff. ¶¶ 23–40) and a section describing the "Need for Continued Interception (*Id.* ¶¶ 43–56). The Ricko Affidavit explains that despite the information gathered from the wiretap, as well as from continued traditional investigation, "the goals of this investigation have not yet been met." (*Id*. ¶ 43.) By way of illustration, the Ricko Affidavit lists a number of participants in the drug conspiracy, including Pullins, who were recognized as a result of the wiretap. (*Id*.) The Ricko Affidavit goes on to say that

> [t]he manner in which these named participants participate in the commission of the offenses enumerated in the application and order, the identities of their confederates, their places of operation and precise nature and scope of the illegal activities and conspiracy involved therein remain to be fully established . . . . Surveillance coupled with wire interceptions over the subject telephone is necessary to allow investigators to continue to identify these individuals' contacts and transactions with COLES and other known conspirators.

(*Id*.) Furthermore, the Ricko Affidavit explains that although the investigators continued to pursue traditional investigative avenues, "the trafficking of cocaine and crack at the level that COLES is involved in is typically not conducted in an open forum and therefore largely unobservable by conventional surveillance." (*Id*. ¶ 47.) The Ricko Affidavit illustrates the

problems with other investigative techniques by describing, for example, the unlikelihood of persuading Coles' associates to cooperate with investigators (*Id*. ¶ 48). Likewise, undercover officers could not be planted in Coles' operation because "[t]he conspiracy is tightly woven, highly secretive, security conscious and violent." (*Id*. ¶ 52.) In addition, traditional investigative techniques, such as interviews and grand jury subpoenas, continued to carry the risk of disclosing the existence of the investigation to Coles. (*Id*. ¶¶ 50, 51.) The Ricko Affidavit also details the "highly time sensitive" nature of storing cocaine. (*Id*. ¶ 55.) Confidential informants could not provide information about locations of bulk cocaine storage that was sufficiently current to be of value. (*Id*.) The straw purchases and money laundering activities also impeded traditional surveillance. (*Id*. ¶ 45, 56.) The Ricko Affidavit explains that "the true nature of transactions conducted by others for COLES, and COLES' control over these assets, is only revealed through wire interceptions of conversations by the parties involved." (*Id*. ¶ 56.)

Like *Armocida*, the Tropea and Ricko affidavits explain how search warrants would be ineffective and surveillance efforts would be detected. Like *Vento* and *Williams*, the affidavits detail how Coles' wariness of surveillance and the insularity of the organization limited the usefulness of confidential informants and physical surveillance.[7] We are satisfied that the Government's affidavits here clearly satisfy the Third Circuit standards for fulfilling the Title III application requirements of Sections 2518(1)(c) and (3)(c).

### B.     *Franks* Hearing

At the Suppression Hearing on August 13, 2007, counsel for Defendant Johnson

---

[7]Like *Lewis*, the Tropea affidavit explains that confidential sources cannot engage Coles or his high-level conspirators without disclosing the existence of the federal investigation.

challenged the Title III affidavit based upon the relative amounts of information in (1) the

Tropea Affidavit for the Title III interceptions and (2) an affidavit, prepared by Agent Tropea,

which is attached to the search warrant application for various properties and vehicles associated

with Coles.  (Suppression Hr'g Tr. 21-22, August 13, 2007.)  This challenge does not appear in

Defendant's Motion to Suppress (*see* Doc. No. 299), nor did counsel request a *Franks* hearing

during the Suppression Hearing.  (*See* Hr'g Tr. 29).  In a later filed Memorandum of Law of

Defendant Hakiem Johnson in Support of the Motion to Suppress the Title III Wire Interceptions

(Doc. No. 521), counsel supplemented the arguments made at the Suppression Hearing and

requested a *Franks* hearing to determine why information was allegedly withheld from the Title

III applications (*id.* at unnumbered 2).[8]

Defendant Johnson contends that in contrast to the allegedly boilerplate Title III affidavit,

"[t]he search warrant affidavit contains a detailed description of information gathered, and how

such information was gather prior to the government's applications for Title III interceptions."

(Doc. No. 521 at unnumbered 3.)  Defendant Johnson lists in his memorandum, and attached as

an exhibit, the "[n]umerous facts contained in the 127 page search warrant affidavit but omitted

from the Title III inception [sic] applications." (*Id*. at unnumbered 5; Exhibit "A.")  Defendant

---

[8]In his memorandum, counsel continues to maintain that the Government employed "non-descriptive, boilerplate language" in its affidavit.  (Doc. No. 521 at unnumbered 3.)  The Defendant somewhat disingenuously supports this proposition by quoting from a paragraph in the affidavit that listed the alternative techniques that had been attempted and failed.  (*Id*. at unnumbered 3 (citing Tropea Aff. ¶ 73).)  Defendant states that this generic language "fails to articulate what exactly was tried and failed." (Doc. No. 521 at unnumbered 3.)  In quoting from that paragraph, however, the Defendant has omitted the first three words – "[a]s illustrated below" – which demonstrate that the paragraph functions as an introduction and not an analysis. Furthermore, the Defendant fails to mention that following paragraph 73 were twelve paragraphs that laid out in explicit detail exactly which conventional investigatory techniques were attempted and failed, or were not attempted, and why.  (*See* Tropea Aff. ¶¶ 74–85.)

Johnson concludes that "[i]t is our position that had Judge Robreno been made aware of the full extent of the information gathered prior to the Title III interception applications his decision would have been different." (Doc. No. 521 at unnumbered 5.)

The Supreme Court in *Franks* stated that there is "a presumption of validity with respect to the affidavit supporting the search warrant." *Franks,* 438 U.S. at 171.  A defendant seeking a *Franks* hearing must make a "substantial preliminary showing," *id.* at 170, that (1) the affidavit contains a material misrepresentation, (2) the affiant made the misrepresentation knowingly and intentionally, or with reckless disregard for the truth, and (3) the allegedly false statement was material to the finding of probable cause.  *See id.* at 155-56, 171; *see also United States v. Brown*, 3 F.3d 673, 676 (3d Cir. 1993).  Only if such a showing is made will a defendant be granted an evidentiary hearing on the issue of the affiant's veracity.  *See Franks*, 438 U.S. at 155-56.  The requirement of a "substantial preliminary showing" is intended "to prevent the misuse of a veracity hearing for purposes of discovery or obstruction." *Franks*, 438 U.S. at 170–171. Where the defendant asserts that the affiant omitted facts with a reckless disregard for the truth, the defendant can satisfy the substantial preliminary showing standard by demonstrating that "an officer recklessly omit[ed] facts that any reasonable person would want to know." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (citing *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000)).  If the defendant makes this preliminary showing, but "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id*. at 171–172.  If "the remaining content is insufficient," then the defendant is entitled to a hearing. *Id*. at 172.

After reviewing the contents of the Government's affidavits in support of the Title III

wiretaps and comparing it with the affidavit accompanying the search warrant application, we

conclude that Defendant's request is without merit.  The initial affidavit by Agent Tropea and the

search warrant affidavit by Agent Tropea contain substantially similar accounts of information

gathered from the confidential sources.  The initial affidavit submitted to Judge Robreno

contains approximately fifty-three (53) paragraphs detailing information from the confidential

sources and Agent Tropea's corroboration efforts.  The search warrant affidavit contains

approximately seventy (70) such paragraphs.  However, the purpose of the search warrant

affidavit was to obtain a search warrant to search "locations and automobiles" (Search Warrant

Aff. ¶ 2) related to Defendant Coles' drug operation.  Therefore, the search warrant affidavit had

to establish probable cause to search the various properties and automobiles listed.  By contrast,

the wiretap affidavit was targeted to establishing probable cause to intercept Defendant Coles'

cellular phone number.  Moreover, Agent Tropea specifically stated in his Title III affidavit:

> Because this affidavit is being submitted for the limited purpose of securing
> authorization for the interception of wire communications, I have not included every
> fact known to me concerning this investigation.  I have only set forth the facts that
> I believe are necessary to establish the foundation for an order authorizing the
> interception of wire communications.

(Tropea Aff. ¶ 4.)  Despite the slight difference in the affidavits, the two affidavits convey an

essentially identical picture of the pre-wiretap investigation.  Moreover, we reject Defendant's

assertion that the wiretap affidavit is generic and boilerplate.  We are satisfied that the inclusion

of the additional information in the search warrant affidavit was not done with the intent to

mislead Judge Robreno.  Furthermore, we are satisfied that if Judge Robreno had been given the

additional information from the search warrant affidavit it would not have altered his decision to

enter an order authorizing an interception of Defendant Coles' cellular phone pursuant to Title

III.  The Defendant has failed to make the "substantial preliminary showing" required for a

*Franks* hearing.

   **C.     Minimization**

   In addition to the "necessity" argument, Johnson and Pullins charge that the Government

failed to properly minimize interceptions.[9]  (Doc. No. 299 at 8; Doc. No. 311 at 8.)  At the

August 13, 2007 Suppression Hearing, counsel argued that the Government's interceptions were

duplicative because four-hundred eighty-five (485) calls were recorded during the same period

of time that confidential sources were under surveillance speaking to conspiracy participants.

(Hr'g Tr. 33–34.)  Counsel for Defendant Pullins also argued that the Government failed to

minimize calls that were unrelated to the investigation.  (*Id*. at 35.)  Counsel discussed five (5)

conversations, which he described as "innocuous, completely unrelated conversations" (*id*.), that

the Government recorded in full (*see id*. 35–36).  For example, counsel referred to a conversation

between Defendant Coles and Defendant Pullins as follows:

> [M]y client is heard saying you're not going to the movies.  Mr. Coles says, we can
> go as soon as I'm done doing what I'm doing.  Monique Pullins says, I went to see
> the dog.  Mr. Coles says, who did you go with to see the dog.  My client says, who
> went with you? No one.  Mr. Coles says, did you like the dog?

(*Id*. at 36.)  Counsel concluded that the Government's failure to terminate such calls immediately

was "in contravention" of the Tropea Affidavit's minimization assurances.  (*Id*. at 37; *see* Tropea

---

   [9]Neither Johnson nor Pullins cite to any transcripts or documents related to this case in
their briefs.  In fact, the only case-specific reference in the Johnson Motion appears to concern a
different case: "As discussed above the conduct of the principal officers conceded in the state
trial demonstrates that there was no minimization!" (Doc. No. 299 at 8.) The Pullins' Motion
states: "Because in the instant case, it appears, **all** calls were intercepted and recorded, in their
entireties, there was no minimization.  As such, these violations warrant suppression." (Doc. No.
311 at 8.)  This sentence is the only statement of "fact" in the minimization section and has no
accompanying citation to the record in this case.

Aff. ¶ 88.)

The Government, in its consolidated response and at the Suppression Hearing, responded that it adequately minimized interceptions in accordance with Section 2518(5) and controlling case law. (Doc. No. 483 at 14.) The Government pointed to the existence of court supervision, in the form of wire intercept reports sent to Judge Robreno every ten days (*id*. at 14); the fact that "from 1.5 to 10.4 percent of calls were minimized" (*id*.); the fact that calls were only recorded "during the hours most likely to result in pertinent calls" (*id*. at 15); and the fact that the investigators were monitoring a drug organization, which used "coded language" (*id*.). The Government noted that defense counsel did not indicate how long the allegedly irrelevant conversations lasted (Hr'g Tr. 38) and that the conversations may have lasted only one or two minutes, which is a permissible amount of time for investigators to listen and determine whether the conversation is relevant (*id*. at 38). The Government argued that the "vast majority of these intercepted calls were two minutes or under." (*Id*. 32:19–20.)

Section 2518(5) of Title III requires that orders authorizing the interception of a wire communication contain a "minimization" provision stating that the intercept "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective." 18 U.S.C. § 2518(5).

Where Defendants challenge the Government's interception of non-pertinent conversations, our inquiry begins by determining "whether or not under the circumstances presented here the intercept procedures were conducted so as to reduce to the smallest practicable number the interception of innocent, i.e. 'personal', [sic] calls." *Armocida*, 515 F.2d

at 43.  The *Armocida* court observed, however, that it did not believe "that electronic surveillance can be conducted with the total elimination of innocent conversations." *Id*. at 45. Nor is such total elimination of non-pertinent interceptions required: "The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States*, 436 U.S. 128, 140 (1978).

The Supreme Court has refused to adopt a strict standard for minimization, finding instead that whether government agents adequately minimized interceptions "will depend on the facts and circumstances of each case." *Scott*, 436 U.S. at 140.  The Third Circuit has advised that "[o]ur inquiry is on the 'reasonableness' of minimization efforts, under the totality of the circumstances." *United States v. Hull*, 456 F.3d 133, 142 (3d Cir. 2006) (citing *Scott*, 436 U.S. at 140).  In *Scott*, the Court found that such circumstances included "the purpose of the wiretap and the information available to the agents at the time of interception." *Scott*, 436 U.S. at 132-33. *See also Vento*, 533 F.2d at 854 ("Minimization is not to be judged by a rigid hindsight that ignores the problems confronting the officers at the time of the investigation.").  Thus, minimization requirements are less stringent where, because of coded language and one-time only calls, "agents can hardly be expected to know that calls are not pertinent prior to their termination." *Scott*, 436 U.S. at 140.

The Third Circuit further instructs that "[t]he mere *number* of intercepted, but non-pertinent calls, is not dispositive." *Hull*, 456 F.3d at 143 (citing to *United States v. Adams*, 759 F.2d 1099, 1115 (3d Cir. 1985)).  In *Armocida*, where agents intercepted seventy-seven (77) "personal" calls, most of which lasted less than two (2) minutes, the court stated that under the

circumstances it would not find "that a full interception of a one-and-one-half minute to two minute conversation violates the minimization requirements." *Armocida*, 515 F.2d at 45.

The Third Circuit has articulated three "crucial" factors for the minimization analysis. *Armocida*, 515 F.2d at 44. First, a court reviewing minimization efforts should consider "the nature and scope of the criminal enterprise under investigation." *Id*. "[S]omewhat greater latitude may be allowed where conspirators converse in a colloquial code, thereby creating superficially innocent conversations that are actually relevant to the investigation." *Id*. Moreover, large-scale investigations of criminal conspiracies may need to intercept a greater number of conversations, especially when "the judicially approved wiretap is designed to identify other participants in the conspiracy and to determine the scope of the conspiracy." *Id*. More recently, the *Hull* court reiterated that "when investigating a wide-ranging conspiracy between parties known for their penchant for secrecy, broader interceptions may be warranted." *Hull*, 456 F.3d at 142.

Second, courts should consider "the government's reasonable expectation as to the character of, and the parties to, the conversations." *Armocida*, 515 F.2d at 44. By way of example, "if the government knows during what time of the day the telephone will be used for criminal activity, it can avoid intercepting calls at other times." *Id*. The Supreme Court in *Scott* explained that while agents should not listen to every call over a wiretap on a public telephone where one person is suspected of placing illegal bets, "if the phone is located in the residence of a person who is thought to be the head of a major drug ring, a contrary conclusion may be indicated." *Scott*, 436 U.S. at 140.

Third, "the degree of judicial supervision by the authorizing judge" must be considered. *Armocida*, 515 F.2d at 44. Section 2518(6) of Title III "permits a district judge, once he has

22

authorized a wiretap, to continue supervising the operation of the interception by requiring reports from the government."*Id*.  Such supervision should be taken into consideration when determining the adequacy of the government's minimization efforts.  *Id*. at 44-45.

We are satisfied that the Government's minimization efforts in this case were reasonable under the circumstances. The Government affidavits contained the requisite "minimization" provisions.  (*See* Tropea Aff. ¶¶ 87–90; Ricko Aff. ¶¶ 58–60.)  The Tropea Affidavit promised that "[i]f the named interceptees are participants in a conversation, monitoring will be terminated if the conversation is non-criminal in nature." (Tropea Aff. ¶ 88.)  The Tropea Affidavit assured the authorizing judge that it would minimize conversations involving attorney communications relating to other criminal charges.  (*Id*. ¶ 89.)  Regarding the overall purpose of the wiretap, the Tropea Affidavit requested that "the interception process not automatically terminate when communications . . . are first intercepted, but that the process continue until communications are intercepted that reveal the full scope of the conspiracy, the identity of the participants, the precise function of each within the conspiracy, and the drug distribution network involved." (*Id*. ¶ 90.)

Considering the reasonableness of the minimization effort in light of the factors set forth in *Armocida*, under the first factor we note that the "nature and scope" of Defendant Coles' organization did not easily lend itself to minimization efforts.  The drug operation and conspiracy was large enough that even after months of investigating with traditional techniques the Government did not know its entire scope.  Learning the extent of the drug operation was an express purpose of the investigation, as articulated in the Tropea Affidavit.  Moreover, as a drug organization, the participants were likely to speak in "coded language," which could  further

hinder agents' abilities to quickly characterize a call as pertinent or non-pertinent.  Moreover, as Agent Tropea noted, "a very high percentage of drug-related telephone calls are brief and cryptic." (Tropea Aff. ¶ 66.)

Under the second *Armocida* factor, we note that the Government expected Defendant Coles' cellular telephone to be used heavily in communicating to co-conspirators with regard to the drug operation.  As set forth in the wiretap affidavit submitted by Agent Tropea, the Government believed that Defendant Coles' cell phone was at the center of the drug conspiracy: "In my experience, the issue for investigation is not whether a cellular telephone is being used by a high level trafficker, but which cellular telephone is being used.  This investigation has concluded that COLES is using the Subject Telephone." (Tropea Aff. ¶ 70 n.39.)  Agent Tropea summarized his pen register analyses of Defendant Coles' telephone calls and concluded that the length and pattern of calls was consistent with that of a phone used to coordinate a drug operation.  (*Id*. ¶ 66.)  He explained, for example, that

> [t]he overwhelming number of incoming calls, about 7 out of every 10 calls, as well as the much larger ratio of unanswered incoming calls versus unanswered outgoing calls, in my experience investigating large-scale drug organizations, is indicative of the volume of calls placed *to* an organization's source of supply by the source's lieutenants, managers, and street supervisors.  Moreover, the nature of these calls, more specifically their duration, is significant in that it is representative of the conversations that frequently occur between coconspirators, drug customers, and other drug associates involved in the sale and distribution of narcotics.

(*Id*.)  Nevertheless, the Government only monitored during the twelve-hour period that would be "most likely to result in pertinent calls." (Hr'g Tr. 32.)

Finally, during the life of the wiretap, the Government was under the judicial supervision of Judge Robreno, the authorizing judge.  Every ten days, the Government submitted records of the wiretap investigation to the court.  (Doc. No. 483 at 14.)  These records showed that

"anywhere from 1.5 to 10.4 percent of calls were minimized during any given recording cycle."

(*Id.*) In addition, when the Government sought Judge Robreno's authorization to renew the

wiretap, Agent Ricko described the number and pattern of telephone calls as follows:

> A summary of pertinent calls during the first 15 days of the period of interception is set forth below: To date, investigators have intercepted a total of approximately 4,300 calls, or approximately 280 calls per day. About 222 of these calls have been deemed pertinent, that is, related to COLES's cocaine operation and proceeds of his business. Of the approximate [sic] 4,300 total calls intercepted thus far, over 3,900 have lasted less than 2 minutes in duration, while about 300 have exceeded 2 minutes.

(*Id.* ¶ 23.) With so many calls lasting such a short time, along with coded language and many

participants, known and unknown, the agents may well have had to listen to entire telephone

calls to determine whether the call was pertinent or not. The fact that the Government

intercepted some non-pertinent calls does not render invalid their minimization effort under the

circumstances.

With regard to counsel's argument concerning duplicative interceptions, we note that

"[t]he minimization mandated by section 2518 does not compel agents to conclude their

interceptions upon finding the minimum evidence necessary to show culpability." *Vento*, 533

F.2d at 851. Judge Robreno authorized the wiretap knowing of the broad scope of the

investigation. The investigation involved a large conspiracy, many participants, coded language,

and a high-volume of extremely brief phone conversations. We are satisfied that the

Government's wiretap interceptions were neither excessive nor unduly duplicative.

For these reasons, Defendants' motions to suppress the wiretap communications will be

dismissed.

An appropriate order follows.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 05-440 |
| ALTON COLES, ET AL. | : | |

**<u>ORDER</u>**

AND NOW, this <u>4th</u> day of October, 2007, upon consideration of Defendant Alton

Coles' Motion To Suppress Evidence Obtained From The Interception Of Wire Communications

(Doc. No. 304), Defendant Hakiem Johnson's Motion To Suppress All Intercepted Wire

Communications (Doc. No. 299), and Defendant Monique Pullins' Motion to Suppress All

Intercepted Wire Communications (Doc. No. 311), and all documents submitted in support

thereof and in opposition thereto, it is ORDERED that the Motions are DENIED.

IT IS SO ORDERED.

BY THE COURT:

_____

R. Barclay Surrick, Judge