IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 05-440 (01, 08, 12, 13, 18, 22) |
| ALTON COLES (01) | : | |
| TIMOTHY BAUKMAN (08) | | |
| MONIQUE PULLINS (12) | : | |
| JAMES MORRIS (13) | | |
| ASYA M. RICHARDSON (18) | : | |
| THAIS Y. THOMPSON (22) | | |

**GOVERNMENT'S TRIAL MEMORANDUM AND
<u>MOTION IN LIMINE</u>**

The government submits this Trial Memorandum and Motion In Limine in advance of the trial of defendants Alton Coles, Timothy Baukman, Monique Pullins, James Morris, Asya Richardson and Thais Thompson. Jury selection is scheduled to begin on December 18, 2007. Trial is scheduled to begin January 14, 2008.

## I.    SUMMARY OF EVIDENCE

Alton Coles was the leader and organizer of a cocaine and cocaine base ("crack") distribution gang, referred to as the COLES Cocaine Gang ("CCG"), which distributed approximately 1,200 kilograms of cocaine and 600 kilograms of crack, conservatively valued at no less than $25,200,000, between January 1998 and August 10, 2005. Coles obtained kilogram quantities of cocaine from defendant James Morris, among others, during this period. Morris, who lived in New Jersey, obtained his cocaine from Texas and Mexico. Morris and Coles had the cocaine transported to the Delaware Valley region, where it was distributed as cocaine powder, or "cooked" into crack, and then distributed through various co-conspirators to

1

customers of the CCG in Philadelphia, Delaware County, Chester County, Baltimore, and elsewhere.

Defendant Timothy Baukman was Coles' principal partner in the CCG. Defendants Dante Tucker, Hakiem Johnson, Terry Walker, and Jamar Campbell were top-level managers for the CCG. Defendants Al Zuagar, Charlton Custis, Desmond Faison, and Gary Creek were "weight" distributors and managers of street corner retail sales for the CCG. Defendants Keenan Brown, Anwar Linder, Tyrek Mcgeth and Antonio Jackson, among others, managed corners and also engaged in direct hand-to-hand sales of cocaine. Defendants Lynette Simpson and Robert Cooper engaged in hand-to-hand sales of cocaine and crack. Defendant Adrian Mckenzie carried false law enforcement credentials while serving as an armed bodyguard for defendant Alton Coles.

The CCG used many locations to store and manufacture cocaine and crack, as well as to store firearms, money and other paraphernalia necessary to conduct its business. Defendant Monique Pullins managed and maintained a storage and distribution facility located at 1416 Clearview Street, Apartment F520, in Philadelphia. James Morris and Thais Thompson maintained another such facility at Thompson's house, where agents found kilo wrappers, scales, more than $550,000 in cash, a firearm, more than a hundred rounds of live ammunition, a money counting machine, and other paraphernalia during a search on August 10, 2005. Defendant Terry Walker and unindicted co-conspirator Randall Austin managed and maintained another, at 2636 Daphne Road, Philadelphia, until the location was raided by police in 2002. Alton Coles, Timothy Baukman and Dante Tucker maintained a third, and perhaps the largest, such drug storage facility, at 339 East Essex Avenue, Lansdowne, Pennsylvania. Agents searching 339

East Essex found 10 firearms, various ammunition, a twelve-ton drug "press," used to repackage kilograms of cocaine, 44 used wrappers used to wrap kilograms of cocaine, ½ kilo of cocaine, scales and a wide variety of drug packaging paraphernalia.

In order to conduct their business, defendants involved in the CCG routinely carried firearms. They also routinely obtained, possessed, and used identification cards, such as Pennsylvania Driver's Licenses, containing false information, and also used aliases to conceal their identities, activities, and roles in the CCG. The CCG also routinely used telephones to arrange meetings and deliveries relating to their drug distribution business, and maintained drug transaction records, commonly referred to as "tally sheets."

Coles and Baukman laundered their enormous cash income from drug trafficking through a variety of transactions, including Coles' purchase of a half-million dollar home in New Jersey, using structured funds and a fraudulent loan transaction with his girlfriend, Asya Richardson. Baukman rented the "stash house" apartment at 339 East Essex Avenue under a nominee name. Baukman and Coles purchased and paid for various automobiles by using various nominees. James Morris used his girlfriend and the mother of his children, Thais Thompson, to lie to the grand jury investigating this matter to hide his ownership of the more than $550,000 in drug money found at 5 North Burden Hill Road, to hide his bank account in Delaware, and to hide the fact that he had paid $25,000 in cash to Alton Coles attorney.

The government will introduce a wide variety of evidence at trial concerning a number of episodes of CCG drug trafficking activities. This evidence will consist of Philadelphia Police Department (PPD) arrests from 1998 to 2005, ATF investigative activity during 2004 and 2005, including surveillance, search warrants, telephone analysis, consensual

telephone contacts with conspirators, cooperating witness testimony, the testimony of non-conspirator civilian witnesses, wire interceptions, and the results of extensive financial investigation and analysis by the IRS.  A general description of the expected focal points of the evidence at trial is supplied below.

### *CCG Cocaine and Crack Cocaine Sales in the 2000 Block of South Cecil Street*

By approximately 2002 Coles had begun distributing directly to Charleton Custis, who distributed to, among others, street level sellers in the 2000 block of South Cecil Street. Before this point Coles had distributed to Rasheed Calhoun, who in turn distributed to Custis and others.  By late 2004 and early 2005, Coles began distributing directly to Al Zuagar, who in turn distributed to, among others, sellers at the 2000 block of South Cecil Street.  The government will introduce a variety of evidence concerning Coles' and the CCG's distribution of crack in the vicinity of the 2000 block of South Cecil Street, including police testimony about drug and gun arrests throughout the period 2000 to 2005, testimony from ATF and police agents about coordinated surveillance, controlled buys and monitored telephone conversations beginning in late 2004 and proceeding through 2005, testimony by cooperating witnesses, analysis of telephone contacts between conspirators, wire interceptions beginning in May of 2005, and the results of search warrants executed throughout the period, culminating in a series of search warrants executed on August 10, 2005 by ATF, Philadelphia Police and other law enforcement agencies.  Paragraphs 1-24 of the "overt acts" section of count one of the indictment describe many of the events that will be proven at trial.

The government will introduce evidence that starting in 2002 Alton Coles arranged deliveries to Custis through defendants Hakiem Johnson and Jamar Campbell, and that

Rasheed Calhoun and Alton Coles had a falling out, and were now rivals.  The government will also establish through police arrests and testimony that during the summer of 2004, an unindicted co-conspirator named Troy Wilson, a/k/a "Boom," began working as a street seller of crack cocaine for defendant Custis.  On October 22, 2004, Alton Coles arranged a confrontation with Rasheed Calhoun at the corner of the 2000 block of South Cecil and Kingsessing Streets.  With Coles were Timothy Baukman, Jamar Campbell, Charleton Custis, Adrian McKenzie and others.  The confrontation escalated, and Troy Wilson, a/k/a "Boom," a member of CCG, shot a member of Rasheed Calhoun's "squad," at which point the two gangs traded volleys of gun-fire.  The battle took place just a few feet from a school-yard, and a block from a church.  Two people were shot, one was left for dead, but saved by police, and police recovered 54 fired cartridge casings ("FCCs")  fired from at least seven firearms.

Jamar Campbell was shot in the buttocks; the hospital records of his visit to a hospital will be placed into evidence.  Police responded to the crime scene and collected approximately 54 fired cartridge casings ("FCCs").  A number of the FCCs were later matched to a firearm taken from Jamar Campbell after he attempted to draw his weapon on a police officer during a drug arrest in May of 2005.  The government will also prove, that on February 27, 2005, in southwest Philadelphia, Troy Wilson and Leroy Perkins, unindicted co-conspirators, engaged in a gun battle with the same rival drug trafficking group as part of the ongoing hostilities that erupted in gun-fire on October 22, 2004.

### CCG Cocaine and Crack Cocaine Sales in the Paschall Housing Project

The government will prove that Coles was supplying cocaine to Desmond Faison by 2002.  Faison controlled distribution at the Paschall Homes projects in Southwest

Philadelphia.  The government will introduce various evidence concerning a variety of historical police investigations at the Paschall Homes projects.  These stops involved CCG conspirators, including Desmond Faison, Anwar Linder, Tyrek McGeth and Lynette Simpson, conducting their drug trafficking business.  The government will also introduce the results of various investigative steps taken during late 2004 and early 2005 by ATF and PPD at the Paschall Homes housing project.  Many of the episodes to be presented through evidence at trial are described at paragraphs 25-42 of the "overt acts" section of count one.

### *Illegal Firearms And Ammunition Possession By Defendant Alton Coles*

The government will introduce evidence of various firearms seized from Alton Coles during the course of the conspiracy.  On May 14, 2002, Coles possessed, on his person and in his black Mercedes Benz, found at Metro Auto Sales, approximately $2,500 in cash, car keys belonging to the Mercedes, a loaded nine millimeter semi-automatic and various documents.  Coles was wanted at the time on a New Jersey warrant arising from his failure to appear under a conviction for possession with intent to distribute cocaine in 1996.  The government will also introduce evidence of Coles' gun arrests of March 27, 2004 and October 24, 2004 in Philadelphia, and his possession of numerous firearms on August 10, 2005, including a .40 caliber pistol found at his residence at 292 Mannington-Yorktown Lane, in Woodstown, New Jersey, and a 9 millimeter pistol found at 1416 Clearview Street, Apartment F520, in Philadelphia, which he directed defendant Monique Pullins to discard by throwing down a trash chute during a 3 a.m. telephone call with Pullins.  The government will also introduce a pistol magazine loaded with .40 caliber ammunition, together with approximately 145 rounds of live .44 caliber pistol ammunition, a gun box, tally sheets, and a gun barrel cleaning device found at

117 Dillon's Lane, in Mullica Hill, New Jersey, where defendant Coles lived with his paramour

Asya Richardson, and where he was arrested the morning of August 10, 2005.

### Defendant Jamar Campbell's Possession of Cocaine, Crack Cocaine, and a Firearm

The government will introduce evidence that on May 16, 2005, defendant Jamar

Campbell was arrested with approximately 124.5 grams of cocaine and a loaded .40 caliber

pistol.  Campbell tried to "draw" on the officer arresting him, but dropped the gun as he drew.

ATF and PPD later matched the ballistics from this weapon to some of the 9 millimeter FCCs

found at the scene of the gun battle on October 22, 2004 at Kingsessing and South Cecil Streets

in Southwest Philadelphia.   The government will also introduce evidence of the various

telephone calls between Alton Coles and others discussing Campbell's arrest and the effort by

Coles and Campbell to recover cocaine still located in a fireman's boot within the trunk of

Campbell's car, which had been removed to a police impound lot.  The government will

introduce evidence of ATF's search of the car and its location of the fireman's boots, in which

agents found approximately 187.28 grams of cocaine.  The government will introduce a number

of telephone calls and surveillance concerning Campbell's narcotics related transactions with

Coles and others.

### The June 28, 2005, Delivery of Cocaine to Defendant Gary Creek

The government will introduce evidence about an arrest on June 28, 2005 of Gary

Creek, Antonio Lamont Jackson and Bridgette Henderson, and of their meeting with co-

defendant Dante Tucker, who delivered approximately 484 grams of cocaine to defendant during

the transaction.  The government will also introduce evidence of various telephone calls between

Alton Coles and others discussing the meeting, the arrest, Coles' arrangements for defense

counsel, and steps to be taken to address the arrest, including the effort to silence a co-defendant who was talking too much.  The government also expects to introduce testimony about several drug locations run by Gary Creek in Baltimore, and the nature of Creek's drug trafficking arrangements with Coles.

### *Defendant Timothy Baukman's Possession of Crack Cocaine and Firearms*

The government expects to introduce historical evidence pertaining to Timothy Baukman's possession of crack cocaine, and to Randall Austin's[1] possession of distribution quantities of cocaine base in front of one of Baukman's former residences.  The various historical episodes are described in paragraphs 56-58 of the "overt acts" section of count one of the indictment.

The government also expects to introduce evidence that on August 10, 2005, Baukman possessed a 9 millimeter firearm that had been converted to an automatic weapon, a second 9 millimeter semi-automatic pistol, and a .38 caliber revolver, all of which were loaded, at his residence at 2967 School House Lane, Apartment C1101, in Philadelphia.  Baukman also had approximately $25,000 in currency and thousands of dollars worth of other valuables at this apartment.  In addition, Baukman possessed a wide variety of drugs, drug paraphernalia, and weapons at 339 East Essex Avenue in Lansdowne, Pennsylvania, a location at which Baukman paid the rent since 2002.  The details concerning this location, used by the CCG as a main stash house, are described below.

The government also expects to introduce a variety of evidence about Baukman's

---

[1] Randall Austin, an unindicted co-conspirator and member of the CCG, is also linked to the slaying of Damon Williams and the search at 2636 Daphne Road, a stash house used by the CCG until it was raided by police in April of 2002.

drug trafficking relationship with Coles, including his involvement in the October 22, 2004 shoot-out at South Cecil Street and Kingsessing Avenue in Southwest Philadelphia, through telephone interceptions, telephone contacts and cooperator testimony.  Among the many conversations are several in which Baukman and Coles discuss the fine details of cooking and preparing crack, and the type of protective gear necessary to wear while handling cocaine.

### *The Clearview Street Apartment Storage Facility*

The government expects to introduce evidence, including both telephone interceptions and surveillance results, about Monique Pullins and the drug storage facility at 1416 Clearview Street, Apartment F520, Philadelphia.  Pullins resided there and assisted Coles and other defendants in their drug trafficking activities by making deliveries of cocaine and keeping drugs, records and a firearm in the apartment.  Among other items of evidence, the government intends to introduce testimony about ATF agents' surveillance on May 30, 2005, during which they saw Coles come from the apartment building and throw out trash containing three "kilo wrappers," which were empty wrappers that previously contained three kilograms of cocaine.  The government will also introduce evidence of a telephone conversation on July 2, 2005 between Coles and Pullins, during which they discussed the payments received by and owed to defendant Coles by others for the distribution of cocaine and crack cocaine.  Additional conversations and surveillance the same day will be introduced, during which, at the direction of defendant Coles, defendant Dante Tucker delivered cocaine to defendant Pullins, and Pullins subsequently delivered the cocaine to an individual, known to the grand jury only as "Ham." During another conversation the same date, defendant Coles asked defendant Pullins whether she had any cocaine stored at her Clearview Street Apartment.

9

The government will also introduce evidence that on August 10, 2005 agents recovered a "tally sheet" at the Clearview Street Apartment indicating payments made and owing to defendant Coles for cocaine, together with a currency counting machine and the firearm previously discussed, which Pullins had thrown down a trash chute at the direction of Coles.

### *Hakiem Johnson's Possession and Sale of Cocaine and Firearms*

The government expects to put on evidence about a January 21, 2003, arrest of Hakiem Johnson during which police recovered 246 grams of cocaine from Johnson, as well as numerous telephone calls between Coles and Johnson in 2005, during which they discussed cocaine deliveries, and surveillances of Johnson tied to the intercepted calls. The government will also introduce evidence arising from the search of Johnson's residence at 7130 Upland Street, in Philadelphia, where agents on August 10, 2005 found a loaded 9 millimeter pistol and a loaded .45 caliber pistol. On the same date agents also found 98 grams of cocaine, a digital scale, materials commonly used for packaging cocaine, and approximately 43 live rounds of .45 caliber ammunition in the Ford Thunderbird. The government will introduce numerous telephone conversations between Johnson and Coles discussing various narcotics transactions, and surveillance episodes during which Johnson was seen driving the Thunderbird during narcotics related transactions.

### *James Morris and Thais Thompson: Cash, Cocaine, Firearm and False Statements*

The government will introduce numerous telephone calls between Coles and James Morris during which they discuss cocaine deliveries, including a July 6, 2005 conversation in which they discuss a 50 kilogram delivery, July 15 and 18, 2005 during which they discuss the time frame for the delivery, a July 27, 2005 conversation during which they discuss Morris'

upcoming trip to Cancun to arrange a delivery of cocaine from his Mexican source, and a July 28, 2005 conversation during which Morris and Coles discuss delivery of $100,000 in cash from Coles to Morris.

The government also expects to introduce evidence that on August 10, 2005, defendants James Morris and Thais Thompson possessed approximately $559,396.21 in drug proceeds, several empty "kilo wrappers," a loaded 9 millimeter semi-automatic pistol, approximately 25 loose rounds of .40 caliber ammunition and 113 loose rounds of 9 millimeter ammunition, a digital scale, and a currency-counting machine at their residence at 5 Burden Hill Road in Quinton, New Jersey. Defendant Morris also possessed approximately 499 grams of cocaine hidden in a gold Chevrolet Suburban, together with approximately $2,574 in cash also found in the Suburban. The Suburban was in the driveway of the residence. The government will introduce evidence of surveillance during which agents saw Morris driving the Suburban. The government also expects to introduce Morris' conversation with agents, at the time of the search, during which Morris claimed the money found in the house was his, and a conversation of Thais Thompson with an agent during which she did not claim the money in the house was hers.

The government expects to introduce evidence of Thais Thompson's false declarations under oath at a grand jury session in June of 2006, during which Ms. Thompson denied delivering $25,000 in cash to an attorney on behalf of Alton Coles, denied having knowledge any bank accounts of James Morris, and claimed that the money found at the house was her grandfather's (who had been a boilermaker), given to her more than a year before the search and kept in her house since then. The government will introduce bank documents and a

bank photograph of Ms. Thompson making a deposit to a bank account of James Morris' in

Delaware, as well as a recorded phone conversation, occurring shortly before the grand jury

session, between Ms. Thompson and Mr. Morris during which Mr. Morris directed Ms.

Thompson to make the deposit to his account.  The government will also introduce testimony

from staff members at Mr. Coles' former lawyer's office documenting Mr. Thompson's delivery

of $25,000 in cash to Mr. Coles' lawyer.  The government will also introduce testimony

concerning James Morris' admission that the money was his and that he prompted his girlfriend

to lie for him during the grand jury session.

### *The CCG Storage Facility located at 339 East Essex Avenue*

The government will introduce evidence, in the form of testimony and bank

documents, that Timothy Baukman and Dante Tucker initially rented the apartment at 339 East

Essex Avenue in Lansdowne, but that from about September 2002 to approximately August 10,

2005, defendant Timothy Baukman paid the rent.  The government will also introduce various

document seized at Baukman's apartment, 2967 School House Lane, and at 339 East Essex

Avenue, that tie the East Essex location to Timothy Baukman, as well as surveillance and phone

conversations linking Alton Coles, Dante Tucker, Hakiem Johnson and others to the East Essex

location.  The government will also introduce the results of the search of the location on August

10, 2005, during which agents found 10 firearms, approximately 380 rounds of ammunition, a

12-ton hydraulic press used to form cocaine powder into "bricks" of kilogram quantities of

cocaine for sale, approximately 459 grams of cocaine, approximately seven grams of crack

cocaine, sheets of paper containing notes of drug payments, commonly referred to as "tally

sheets,"various drug paraphernalia, such as scales, bowls, a manual press machine, dust masks,

rubber gloves, tape, plastic bags, and cutting agents, and 44 "kilo wrappers" used to wrap kilogram quantities of cocaine. A number of telephone conversations relating to this facility will be introduced at trial.

### *The CCG Storage Facility located at 2636 Daphne Road*

In April 2002, Randall Austin,[2] a member of the CCG, as testimony will establish, arranged to sell cocaine to two drug trafficking customers from Delaware. The deal took place near the Philadelphia zoo. The deal went sour, Austin attempted to rob the two customers, and killed one of them and wounded the other in the process. Police found Austin at a hospital under the alias "Dante Tucker," having been wounded himself during the exchange of gunfire. Police tracked Austin back to 2636 Daphne Road, which Austin had rented under an alias. When police arrived at 2636 Daphne Road on April 14, 2002, they found Terry Walker, another conspirator who occupied the property with Austin, coming out of the apartment with a "Take Down" jacket on. Police developed probable cause, obtained a warrant and searched 2636 Daphne Road, where they found a total of approximately 490 grams of cocaine in several separate bags, as well as a bag containing approximately 26.32 grams of crack cocaine, together with five firearms, numerous rounds of ammunition of assorted caliber and empty magazines, multiple bags, bowls, plates, cards, spoons and three scales used for preparing cocaine and crack cocaine for resale, and various documents and photographs pertaining to a number of conspirators and to locations frequented by conspirators. Paperwork discovered in the Daphne Road apartment and expected testimony link Coles to the property.

---

[2] Austin, who is serving a lengthy sentence after a recent federal conviction as an Armed Career Criminal, is also serving a sentence of life imprisonment as a result of a murder conviction.

13

***Acquisition of Firearms***

The government intends to introduce a number of telephone conversations between Adrian McKenzie and Alton Coles about the acquisition and use of various firearms, as well as records and testimony concerning the purchase by McKenzie of a Berretta, .45 caliber, semi-automatic pistol, which McKenzie provided to Coles, a convicted felon. The gun was seized during the arrest of Coles on March 27, 2004. On August 10, 2005, at 117 Dillon's Lane, in Mullica Hill, New Jersey, where agents found and arrested Coles, agents also recovered the box in which the Berretta pistol had been packaged at the time of its purchase.

A variety of other conversations between Coles and McKenzie, and another individual named Ameen Lee Wiggins, Coles' half-brother, will be introduced, as they bear on the illegal acquisition of firearms for the conspiracy. For instance, on June 16, 2005, Coles told McKenzie that Coles' "brother," Ameen Lee Wiggins, would be the "insurance plan" in connection with the state charges pending against defendant Coles arising out of his October 27, 2004 arrest for possession of a firearm. During a conversation the same day, Coles told defendant McKenzie that Wiggins would testify that Wiggins possessed the Smith & Wesson and discarded it on October 27, 2004. During a conversation the same day between Wiggins and Coles, Wiggins told defendant Coles that the Firing Line, a federally licensed firearms dealer, did not close until 9:00 p.m. In response, defendant Coles told Wiggins that defendant McKenzie recommended that defendant Coles and Wiggins wait until after defendant Coles' pending trial was adjudicated before they "grab another gun." On June 20, 2005, McKenzie told Coles that his "boy has a nice 25 for a buck and a quarter," that is, that McKenzie knew of an individual who had a .25 caliber pistol for sale for $125.00. On the same date, McKenzie told Coles that

defendant McKenzie knew of an individual named "John" who had a firearm "like a TEC." A "TEC" is street parlance for a TEC-9, a 9 millimeter semi-automatic pistol with an extended magazine, typically holding more than 20 rounds of ammunition. Defendant McKenzie further stated that "I . . . forgot what it is but it's like a f*****g Uzi . . . he's selling that jawn for like 400 or something like that." Defendant Coles responded "I'll take that." An "Uzi" is an Israeli made semi-automatic or automatic pistol with an elongated barrel, large frame and receiver with an extended magazine.

### *Financial Crimes*

### *Money Laundering Conspiracy: Coles and Latney*

The government will introduce evidence concerning two cars, a 2001 Mercedes Benz S-430 purchased by Alton Coles in 2001 for $74,900, and a 2002 Cadillac Escalade purchased by Coles in 2002 for $56,500. Both were purchased from Metro Auto Sales, a small used car dealership located on the Roosevelt Boulevard at Rockland Street in Philadelphia. Coles had the cars titled to Kristina Latney, and arranged for Latney to make fraudulent loan applications to Commerce Bank to finance part of the purchase price of the cars. In these applications Latney claimed to be employed at a hair salon named Outlines II at a salary of $67,500 per year (the Mercedes) and $75,000 per year (the Cadillac). The applications involved the submission of fake W-2s submitted to the bank, fraudulent signatures of Latney's name by Coles on various documents, and were made at a time when Latney had no income, since the salon which ostensibly employed her had been out of business since 1999. Monthly cash deposits from Coles were used to cover the deduction of the loan from a bank account set up in Kristina Latney's name.

The government will introduce evidence that these two cars were given to rapper Beanie Sigel in exchange for a Bentley sometime in 2002. The Bentley, registered to rap producer Damon Dash, was seized at Coles' Mullica Hill residence on August 10, 2005. It was still registered to record producer Damon Dash at the time it was seized. Evidence will establish that Coles drove and serviced the car for years without changing Dash's name on the title or registration.

The government will also introduce evidence about the October 7, 2004 purchase, by Coles, of a used 2000 Ford Excursion from Ameri Motors for $18,900. This car was titled to Naseem Coles, Coles' 6 year old son by Kristina Latney. Coles provided a Pennsylvania drivers license in the name of Naseem Coles, with Coles' picture and a date of birth consistent with Coles' age, as proof of identity. In order to obtain the loan, he prepared an application listing Naseem as the manager/co-owner of Take Down Productions, earning a salary of $110,000 per year. Coles also provided copies of false 2002 and 2003 Federal Income Tax Returns and Forms 1099 under the name and social security number of Naseem Coles, which reported income of $97,242 in 2002 and $110,000 received from Take Down Productions. These returns were not filed with the Internal Revenue Service.

### *Money Laundering Conspiracy: Coles and Richardson*

The government will also submit evidence that on July 29, 2005, settlement took place on a new residential property located at 117 Dillon's Lane, Mullica Hill, NJ. The property was purchased in the name of Asya Richardson for $466,690. Richardson paid for this purchase by placing a deposit of $40,000, obtaining a loan of $373,352, and remitting 3 bank checks totaling $74,000 at settlement. In fact, Richardson is one of Coles' paramours, had minimal

16

income and no savings, and was totally dependent on Coles financially.  This property became the residence of Coles and Richardson for the short period between settlement and the time Coles was arrested at this location on the morning of August 10, 2005.

This purchase originated with the signing of an agreement of sale on February 20, 2005, between Ryan Homes, seller, and Alton Coles and Asya Richardson, buyers.  Coles and Richardson applied for a mortgage at that time with Ryan's mortgage subsidiary.  Richardson listed her income at $22,800 per year as a customer service representative for Bank of America, a position she had held for four months.  This loan was denied and the file was transferred to a mortgage broker, Pike Creek Mortgage Services, Inc.  The owner of Pike Creek, Wayne Moses, was ultimately was able to secure a loan with Chase Home Mortgage.

The application to Chase Mortgage differed from the previous loan application.  Coles disappeared from the application, the purchase agreement was amended to delete him, and Richardson's source of income was listed as follows: $2,000 monthly from the Greater Philadelphia Urban Affairs Coalition, and $7,500 monthly from B101 Radio Station, for total monthly income of $9,500.  The official copy of this application was initialed, signed, and dated by Richardson at settlement.  In fact this employment information supplied by Richardson was false.  Richardson was a former employee of the Greater Philadelphia Urban Affairs Coalition (GPUAC), being hired on a part time basis in June 2001 and separated on August 14, 2002.  Richardson's total income from GPUAC in 2002 was $8,223.27.  Richardson was listed as a part time employee of Radio Station B 101, although on extended medical leave.  She was hired in February, 2004 and last received a pay check on April 14, 2005.  Her total gross compensation in 2005 was $144.  Total compensation for her entire employment was less than $4,000.  The

records of both Pike Creek and B101 show that B101 replied to Pike Creek's inquiry, reporting

that Richardson was employed.  There is no record of any inquiry to GPUAC.

The source of the funds presented as a down payment and at settlement are as

follows:

1.     Coles' $10,000 check at the signing of the agreement. The funds to cover

this check originated with a $10,000 bank transfer two days after the date on

Coles' check.  The source of the funds transferred were two currency deposits into

the a Take Down account, as follows:

| Date of Deposit | Amount |
|---|---|
| 2/15/05 | $2,800 |
| 2/22/05 | $8,600 |
| Total | $11,400 |

2.     A $30,000 additional deposit submitted March 29, 2005.  This transaction

mirrored the initial deposit transaction.  Currency was deposited into a "Take

Down" account, transferred to Coles' personal account, and a check written on

Coles' personal account. The $30,000 transfer took place on 3/28/05, one day

prior to the date affixed on the $30,000 check.  Currency deposits into the "Take

Down" account to cover the check are as follows:

| Date of Deposit | Amount |
|---|---|
| 3/14/05 | $7,000 |
| 3/22/05 | $9,900 |
| 3/23/05 | $4,350 |

| | |
|---|---|
| 3/28/05 | <u>$9,250</u> |
| Total | $30,500 |

3.      A $49,000 Citizens Bank Official Check submitted at settlement.  The immediate source of the funds used to purchase this check was a check from Coles' personal account.  The personal check was covered from cash deposits into the personal account and by a transfer from the same "Take Down" account.  The source of the funds in the Take Down account was currency deposits.

A.  Deposits into Coles Personal Account:

| Date of Deposit | Amount | Source |
|---|---|---|
| 6/14/05 | $ 1,800 | Currency |
| 7/05/05 | $ 2,800 | Currency |
| 7/29/05 | $ 9,200 | Currency |
| 7/29/05 | <u>$36,258</u> | Take Down check |
| Total | $50,058 | |

B. Deposits into Take Down Account

| Date of Deposit | Amount | Source |
|---|---|---|
| 7/11/05 | $5,568 | Currency |
| 7/20/05 | $6,215 | Third party check |
| 7/20/05 | $2,500 | Currency |
| 7/25/05 | $5,096 | Currency |
| 7/27/05 | $3,000 | Currency |
| 7/28/05 | $9,700 | Currency |

| | | |
|---|---|---|
| 7/29/05 | $9,140 | Currency |
| 8/01/05 | $3,160 | Currency |
| Total | $44,379 | |

4.      A $6,000 Wachovia Bank Official Check was submitted at settlement. The funds used to purchase this check were withdrawn from a Wachovia Bank account title to Naseem Coles.  The source of the funds was currency deposits, as follows:

| Date of Deposit | Amount |
|---|---|
| 8/01/05 | $ 160 |
| 8/01/05 | $5,950 |
| Total | $6,110 |

5.      A $19,000 PNC Bank Cashier's Check submitted at settlement.  The funds used to purchase this check originated with a joint personal checking account of Coles and Richardson.  The source of the funds in that account was currency deposits as follows:

| Date of Deposit | Amount |
|---|---|
| 7/29/05 | $9,800 |
| 8/01/05 | $9,200 |
| Total | $19,000 |

Coles made a wild variety of cash deposits under the $10,000 reporting threshold into numerous accounts, then transferred funds between accounts, sometimes several times, before cutting checks that passed to the seller of property.  These transactions constitute both

20

money laundering in an attempt to conceal the true source, nature and ownership of Coles' money, and structuring in violation of 31 U.S.C. § 5324(a)(3).  For instance, Coles deposited over $37,000 in six transactions, each under $10,000, into 4 separate bank accounts on July 29, 2005 alone.  Beginning on July 25, 2005, there were currency deposits of over $45,000 in 9 transactions into those four accounts.  Coles and Richardson are charged with a money laundering conspiracy in count 80, and with money laundering in count 79.  Coles is charged with structuring in counts 81-86.[3]

### *Wire Fraud on a Financial Institution: Richardson and Coles*

Counts 87 and 88 charge defendants Coles and Richardson with wire fraud directed at a financial institution, in violation of 18 U.S.C. § 1343.  These two counts charge the fraudulent loan application that led to the loan that constituted part of the purchase price of 117 Dillon's Lane.  Two faxes, one on 7/11/05 to B101, Richardson's putative "employer" in Bala Cynwyd, and one returned from B101 on 7/13/05, were employment verification forms sent by the mortgage broker to complete the loan application process.  These employment verification forms were integral to the fraud.

### *Money Laundering to Promote Drug Trafficking: Baukman*

Counts 89-120 charge Timothy Baukman with money laundering to promote drug trafficking, in violation of 18 U.S.C. § 1956(a)(1)(A)(I).  From December of 2001 to August of 2005, the apartment located at 339 Essex Avenue, East Lansdowne, PA, was rented by Timothy

---

[3] At trial, Agent Ray Armstrong will testify that for a period of 10 years he asked every potential witness and cooperating defendant in every drug investigation in which he was involved if they knew about the $10,000 reporting requirements.  Without exception, they stated they were aware of the $10,000 reporting requirements, although in many instances they were not aware of the details.

Baukman. The apartment was rented in the name of a nominee, or "straw." The nominee and Baukman, using the name and social security number of Tauheed Baukman, his six year old son, applied to rent the apartment through a real estate broker, Century 21 Adele Shaw Associates. Baukman was removed from the lease because he had a minimal credit history. After rental, the lease automatically renewed for one year periods and was leased to the same nominee on August 10, 2005, when a search warrant was executed at the apartment.

Timothy Baukman opened a checking account at Wachovia Bank under the name and social security number of his six year old son, Tauheed Baukman. Baukman had previously obtained a Pennsylvania driver's license under that name. Beginning in approximately September, 2002, Baukman paid the monthly rent on the apartment by sending checks drawn on this Wachovia account to Century 21. In total, there were 32 checks of $500 (counting an occasional check of $550 to cover late payment charges), ending in July 2005, obtained from Wachovia. Those account records show there were over $202,000 in deposits, of which over $155,000 were currency, during that time period. The deposits were made monthly and were used to cover checks written for predominately three charges; the apartment on Essex, a luxury apartment on Schoolhouse Lane, Baukman's residence, and a car loan on a Jaguar. The Schoolhouse Lane apartment and the Jaguar are addressed below. In total, there were $16,150 in payments made from the Wachovia account to Century 21 for the apartment at 339 East Essex.

A search warrant was executed at the apartment on August 10, 2005. The search revealed no evidence of occupants living there; rather, the apartment was used as a stash house for the CCG drug trafficking operations, as detailed above.

***Money Laundering to Conceal or Disguise Drug Trafficking: Baukman***

Counts 121-175 charge Timothy Baukman with money laundering with the intent to conceal and disguise the true source, nature and ownership of the funds used in various financial transaction. The Wachovia account, opened by Baukman using his son's name and social security number, was used not only to pay for the apartment at 339 East Essex Avenue, but to pay checks to Eastview Realty for the monthly rental on Baukman's apartment, #C1101 at the Alden Park Apartments, 2967 Schoolhouse Lane, Philadelphia. The account was also used to pay Charter One Auto Finance for loan payments on a 1999 Jaguar. Monthly deposits were made to cover checks written for these three expenses.

The Alden Park apartment, shared with Tiffany Dixon, Baukman's girlfriend and mother of Tauheed, was rented in the name of Tauheed Baukman, Baukman's minor child. Beginning in December 2002, there were 26 checks, totaling $45,335.18, written by Baukman in amounts ranging from approximately $1,200 to $1,700, for rent for this apartment, during the same period he was also paying for the apartment at 339 East Essex. Counts 121-146 represent the Schoolhouse Lane checks.

The Jaguar was purchased on February 7, 2002, at Metro Auto Sales. The car was titled in the name of a nominee, with Tauheed Baukman listed as the co-buyer. A loan of $26,848.50 was obtained from Charter One Auto Finance. The monthly payments were $580.94. Beginning in March 2002 and ending in November 2004, when the car was traded in by Baukman, there were 29 checks written to Charter One, totaling $16,947.20, on the Wachovia account.

***Take Down Ltd.***

Approximately January 10, 2002, Alton Coles incorporated an entity known as "Take Down Limited," which purported to be a legitimate record company.  Later in January of 2002, Coles and Take Down Limited entered into an agreement with another entity known as "Get Dat Dough" to produce a musical performance at the Spectrum, a facility located in Philadelphia, Pennsylvania.  Expenses and income were allocated equally between Coles and his corporation, Take Down Limited, on the one hand, and Get Dat Dough, on the other.  From about January 11, 2002, to April 5, 2002, the partnership spent approximately $162,262.86 while producing a "hip hop" performance at the Spectrum, a facility located in Philadelphia. In April of 2002, the partnership realized approximately $142,443.98 in revenue from producing the performance at the Spectrum, which represented a loss of approximately $19,818.88, or $9,909.44 - 50% of the total loss - to defendant Coles and Take Down Limited.

Take Down Limited and the partnership each constitute an "enterprise" as that term is defined in Title 21, United States Code, Section 854(c), which was engaged in, and the activities of which affected, interstate commerce.  The source of funds for Coles and Take Down Limited was drug proceeds from activities of the CCG.  Coles knowingly and intentionally used and invested his drug proceeds in the acquisition of an interest in, and the establishment and operation of, an enterprise, that is, Take Down Limited and the production partnership with Get Dat Dough, both of which engaged in, and the activities of which affected, interstate and foreign commerce.  The Spectrum venture is the subject of count 176, which charges a violation of 21 U.S.C. § 854.

The government also expects to introduce evidence documenting other supposed

24

legitimate sources of income for Coles, including CDs, movies and parties undertaken through various business names such as Take Down Productions, Take Down Records, and Take Down Entertainment, and demonstrating that these ventures produced either a loss or little, if any, profit, and certainly not enough profit to explain Coles' and Baukman's prodigious expenditures during the years 2002-2005.

The government also intends to introduce various financial documents seized during search warrants and obtained from third parties by subpoena, as well as tax records from the IRS, documenting the complete lack, or relative paucity, of legitimate income by Coles, Baukman, Morris, Thompson, Richardson and Pullins, the various "Take Down" enterprises, and Kristina Latney during the years 2002-2005.

## II.    THE LAW

The government describes the general legal principles which should govern at trial, and details the law concerning various evidentiary issues that may arise. Section A, below, deals with count one, and provides a comprehensive discussion not only of the law of conspiracy but also of the legal standards governing admission of evidence to prove a conspiracy. Section B, below, is a shorter section which provides an outline of the essential elements of other counts at issue in this case. In Section C, the government moves *in limine* for rulings on the admissibility of certain evidence.

### A.    Conspiracy: Count One

#### 1.    Conspiracy Generally.

Where the indictment charges the existence of a conspiracy containing multiple members, the United States must provide evidence at trial that will allow a reasonable fact finder

to conclude beyond a reasonable doubt that the defendant and at least one other person shared a "unity of purpose" or the intent to "achieve a common goal" and an agreement to "work together toward the goal." United States v. Applewaite, 195 F.3d 679, 684 (3d Cir. 1999) (citations omitted). The United States is not required to prove the existence of an express or formal agreement; "a tacit understanding is sufficient." Agnail v. United States, 420 U.S. 770, 777 n.10 (1975). Further, proof of the existence of an agreement may be established entirely by circumstantial evidence. Conspiracy law merely requires that the inferences drawn have a logical and convincing connection to the evidence. Applewaite, 195 F.3d at 684. Moreover, "juries are free to use their common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence." United States v. Ramirez, 954 F.2d 1035, 1039 (5th Cir. 1992). To sustain a conspiracy conviction, the government need only show sufficient evidence that the defendant conspired with "someone -- anyone." United States v. Pressler, 256 F.3d 144, 149 (3d Cir. 2001) (quoting United States v. Obialo, 23 F.3d 69, 73 (3d Cir. 1994)).

2.    Factors Demonstrating Existence of a Conspiracy

The conspiracy, in most of its affairs, was quite orderly, and adopted a "chain" structure. Alton Coles and his principal partner Timothy Baukman stood at its head, acquiring vast quantities of cocaine, which they distributed through other lieutenants, who in turn redistributed the drugs to retail operations. As in many conspiracies of this nature, the operation of the conspiracy rested on the existence of long-term business relationships depending upon trust and a mutual understanding of methods of operation. Credit relationships were often a feature of the conspiracy. Different levels of the conspiracy often "fronted" drugs to the next

level, and then collected a portion of the proceeds after subsequent sales.  As the Third Circuit

has observed, such a credit relationship is often a feature of a narcotics distribution conspiracy.

United States v. Gibbs, 190 F.3d 188, 199-200 (3d Cir. 1999).

The conspiracy moved enormous quantities of cocaine along a chain from the

highest levels down to the street sellers who toiled on the corners which their bosses supervised.

The contacts between the main conspirators and their underlings were so routine and so

regularized that the conspiracy could move huge amounts of cocaine very swiftly.  A network of

voluminous telephone contacts with a code system in place, vacations together, joint action in the

face of threats to one corner or conspirator, consistent distribution relationships, a chain of

command, common "stash houses," coordinated telecommunications, the flexibility to "climb the

corporate ladder" without violence ensuing - - all these are earmarks of a conspiracy and a

continuing criminal enterprise.  All bespeak a complex level of cooperation and coordination.

> A pattern of sales for resale between the same persons, together with details supplying a context for the relationship, might well support a finding of conspiracy.  Even a single sale for resale, embroidered with evidence suggesting a joint undertaking between buyer and seller, could suffice    . . .  Common knowledge, interdependence, shared purpose and the other ingredients of a conspiracy are matters of degree. Almost everything in such a case depends upon the context and the details. The evaluation of the facts is entrusted largely to the jury.

United States v. Moran, 984 F.2d 1299, 1303 (1st Cir. 1993) (emphasis supplied; citations

omitted).

"The elements of a charge of conspiracy are: (1) 'a unity of purpose between the

alleged conspirators;' (2) 'an intent to achieve a common goal;' and (3) 'an agreement to work

together toward that goal.'  United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999).  The Court

in  Gibbs noted that "even an occasional supplier (and by implication an occasional buyer for

redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential,

of knowledge that she or he was part of a larger operation.'"  Id. at 198, quoting United States v.

Price, 13 F.3d 711, 728 (3d Cir. 1994), and citing United States v. Theodoropoulos, 866 F.2d

587, 594 (3d Cir. 1989).

The facts that can support the existence of a conspiracy are quite varied.  Some

examples:

- the length of affiliation between the parties, Gibbs, 190 F.3d at 199;

- repeated, familiar dealings, which provide an inference that the buyer "comprehends
fully the nature of the group with whom he [or she] is dealing, is more likely to depend
heavily on the conspiracy as the sole source of his [or her] drugs, and is more likely to
perform drug-related acts for conspiracy members in an effort to maintain his [or her]
connection to them," id.;

- knowledge of buyer that seller sells to people other than himself; knowledge of seller
that buyer is re-seller, Gibbs, 190 F.3d at 201;

- the buyer purchased large amount of drugs from seller, United States v. Pressler, 256
F.3d 144, 153, n.4 (3d Cir. 2001) (citing Gibbs);

- code used in drug transactions, id. (citing Gibbs);

- extensive use of phones between parties involved in drug trafficking, United States v.
Rodriguez, 215 F.3d 110, 117 (1st Cir. 2000);

- credit transactions, United States v. Price, 13 F.3d at 728.

"Numerous suppliers and distributors operating under the aegis of a common core

group can be treated as a single conspiracy.  The government need not prove that each defendant

knew all the details, goals, or other participants."  Id. at 728, citing Theodoropoulos, 866 F.2d at

593.

In <u>United States v. Perez</u>, 280 F.3d 318 (3d Cir. 2002), the Third Circuit noted

several factors that would warrant an inference that defendant was part of a conspiracy:

> (1) the length of affiliation between the defendant and the conspiracy; (2) whether there is an established method of payment; (3) the extent to which transactions are standardized; and (4) whether there is a demonstrated level of mutual trust.

<u>Id</u>. at 343 (citations omitted).

While these factors "are not necessarily dispositive of the issue," <u>id</u>., they

certainly justify a conclusion that there was a conspiracy. "[T]heir presence suggests that a

defendant has full knowledge of, if not a stake in, a conspiracy . . ." <u>Id</u>. "[W]hen a defendant

drug buyer has repeated, familiar dealings with members of a conspiracy, that buyer probably

comprehends fully the nature of the group with whom he is dealing . . ." <u>Id</u>. The conspirator "is

more likely to depend heavily on the conspiracy as the sole source of his drugs, and is more

likely to perform drug-related acts for conspiracy members in an effort to maintain his

connection to them." <u>Id</u>.

> Chain-shaped conspiracies present the classic examples of interdependence. For instance, in <u>Perez</u>, 280 F.3d at 347, we concluded that two drug sellers and a drug smuggler were interdependent, even though there was a middleman between them, because "[the dealers] depended on a scheme involving [the smuggler and the middleman] and the shipment from the Philippines to possess and distribute the illegal drug." <u>See</u> also <u>United States v. Portela</u>, 167 F.3d 687, 697 (1st Cir.1999) (explaining that "a single conspiracy [exists] if the continued health of the trafficking and distribution network necessarily depends on the continued efforts of multiple suppliers"); <u>United States v. Evans</u>, 970 F.2d 663, 670 (10th Cir.1992) ("Interdependence is present when each alleged coconspirator ... depend[s] on the operation of each link in the chain to achieve the common goal." (alterations in original) (internal quotation marks omitted)).

> We also concluded that there was a single conspiracy in <u>United States v. Kenny</u>, 462 F.2d 1205 (3d Cir.1972), a non-drug case. <u>Kenny</u> involved a large-scale scheme that required contractors to pay kickbacks to government officials in order to procure government contracts. <u>Id</u>. at 1217. While the scheme involved a diverse group of individuals, the evidence showed "a determined group who repeatedly cooperated closely to achieve the

common purpose of self-enrichment by extracting kickbacks." Id. Moreover, "[t]he key to success of all their depravities was their common control over the administration of city and county government." Id.; see also United States v. Greenidge, 495 F.3d 85 (3d Cir.2007) (finding single conspiracy where depositors of stolen and altered checks "did not represent independent customers, but were an integral part of this [pyramidal] 'corporate' structure").

United States v. Kemp, WL 2410132, 24 -25 (3d Cir. 2007)

### 3.    Events Not Specifically Alleged in Count One

Title 21, United States Code, Section 846 does not require that the government allege or prove an overt act in order to prove a violation of the statute.  There are a wide variety of facts adverted to in the indictment, count one; there are also a wide variety of facts that were not alleged in the indictment, but which prove the conspiracy.  This additional evidence relates directly to the conspiracy, and is admissible despite the fact that it is not specifically discussed in the indictment.  See United States v. Gibbs, 190 F.3d 188, 217 (3d Cir. 1999) (holding that defendant's participation in uncharged acts of violence was admissible as direct proof of the conspiracy with which he was charged); United States v. Thai, 29 F.3d 785, 812-13 (2d Cir. 1994) ("[i]t is clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy . . . An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather it is part of the very act charged.") (internal quotations and citations omitted).  In United States v. Cross, 308 F.3d 308 (3d Cir. 2002), the Third Circuit explained that "acts are intrinsic when they directly prove the charged [crime]."

### 4.    Admissibility of Co-Conspirator Statements.

Federal Rule of Evidence 801(d)(2)(E) provides that "a statement made by a

co-conspirator of a party during the course and in furtherance of that conspiracy" is not hearsay and may be admitted as evidence against a co-conspirator. In order for a court to admit the co-conspirator statement, the government must prove that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, (3) the statement was made in the course of the conspiracy; and 4) the statement was made in furtherance of the conspiracy. United States v. Bourjaily, 483 U.S. 171, 175 (1987); United States v. McGlory, 968 F.2d 309, 333-34 (3d Cir. 1992); United States v. Gambino, 926 F.2d 1355, 1360 (3d Cir. 1991).

In making a preliminary factual determination as to the existence of a conspiracy and the defendant's participation in it, courts may consider the offered hearsay statement itself. Bourjaily, 483 U.S. at 180-81. "[T]here is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." Id; see also McGlory, 968 F.2d at 334. The district court should consider the totality of the circumstances when deciding the admissibility of such evidence. "The circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement is made, or evidence corroborating the contents of the statement," should be considered by the trial court. See Fed. R. Evid. 801(d)(2) (Advisory Committee Notes); United States v. Traitz, 871 F.2d 368, 399 (3d Cir. 1989). When determining the admissibility of a co-conspirator statement, the existence of the conspiracy and the party's participation in that conspiracy need only be proved by a preponderance of the evidence. Bourjaily, 483 U.S. at 175.

Although casual conversations between co-conspirators are inadmissible, statements that, among other things, maintain cohesiveness and convey information relevant to

conspiratorial objectives are in furtherance of the conspiracy and admissible under Rule 801(d)(2)(E). Traitz, 871 F.2d at 399. Accordingly, "statements of a co-conspirator identifying a fellow co-conspirator as his source of narcotics are statements made in furtherance of the conspiracy." United States v. Lambros, 564 F.2d 26, 30 (8th Cir. 1977); see United States v. Munson, 819 F.2d 337, 341 (1st Cir. 1987); United States v. Anderson, 642 F.2d 281, 285 (9th Cir. 1981).

The Third Circuit has commented that the "in furtherance" requirement is to be given a broad interpretation. United States v. Gibbs, 739 F.2d 838, 843 (3d Cir. 1984); United States v. DePeri, 778 F.2d 963, 981 (3d Cir. 1985). Although the "during the course of" and "in furtherance" requirements do not overlap entirely, they are closely related. United States v. Ammar, 714 F.2d 238, 253 (3d Cir.1983). While mere narratives of past events or mere idle chatter that has no current purpose are not generally deemed to occur in furtherance of the conspiracy, statements that "provide reassurance, serve to maintain trust and cohesiveness among co-conspirators, or inform each other of the current status of the conspiracy" further the conspiracy. Id, at 252; see United States v. Harris, 908 F.2d 728, 737 (11th Cir. 1990); United States v. Hudson, 970 F.2d 948, 958-59 (1st Cir. 1992). For example, statements which are relevant to the distribution of the proceeds of the conspiracy are considered in furtherance of the conspiracy. Ammar, 714 F.2d at 253. In order for statements to be deemed "in furtherance of the conspiracy," they need not actually "further" the conspiracy; it is sufficient that a statement was intended to promote the conspiracy, even if it did not actually do so. See United States v. Williams, 989 F.2d 1061, 1068 (9th Cir. 1993); United States v. Mayes, 917 F.2d 457, 464 (10th Cir. 1990).

The trial court may admit statements pursuant to the Rule even if the statements relate to a conspiracy not charged in the indictment. United States v. Ellis, 156 F.3d 493, 497 (3d Cir. 1998); United States v. Trowery, 542 F.2d 623, 626 (3d Cir. 1976). The rationale for this rule is that the co-conspirator provision in Rule 801(d)(2)(E) is merely a rule of evidence founded on the theory "that a person who has authorized another to speak or act to some joint end will be held responsible for what is later said or done by his agent . . ." Trowery, 542 F.2d at 626.

> 5.    Narcotics Dealing as Evidence of Motive to Possess Gun

It is settled that evidence of narcotics dealing is admissible to show a defendant's motive for possessing a firearm. See, e.g., United States v. Jacobs, 44 F.3d 1219, 1225 (3d Cir. 1995) ("[e]vidence tending to show that the defendant was a participant in the selling of drugs was relevant under Rule 402 and was admissible under Rule 404(b) to show that the defendant had a motive for carrying a firearm"); United States v. Rankin, 902 F.2d 1344, 1346 (8th Cir. 1990) ("[e]vidence that [the defendant] possessed cocaine could establish a motive for possessing a weapon"). United States v. Rivera, 844 F.2d 916, 926 (5th Cir. 1987) (evidence that defendant is narcotics trafficker is evidence of motive to possess weapons). Thus, in this case, the evidence of the drug trafficking conspiracy is relevant to and supports the allegations of gun possession by various defendants.[4]

> 6.    Possession of Firearms as Evidence of Intent to Distribute Narcotics

---

[4] Obviously counts charging a violation of 18 U.S.C. § 924(c) directly implicate the drug trafficking activity of the defendants charged, since drug trafficking is an element of the crime. Drug trafficking activity is also admissible to prove simple possession of a firearm by a felon, charged under 18 U.S.C. § 922(g), because the drug trafficking supplies an obvious motive for possession of a firearm.

Guns are an acknowledged "tool of the trade" in the drug business.  Possession of weapons, in particular handguns, along with other evidence, is powerful circumstantial evidence that an individual is in the drug trafficking trade.  United States v. Price, 418 F.3d 771, 779 (7th Cir. 2005);  United States v. Adams, 759 F.2d 1099, 1108 (3d Cir. 1983) (admission of Uzi type weapons during narcotics trial not unduly prejudicial; guns are "tools of the trade.").  In this case the massive variety of firearms evidence is admissible to prove the drug conspiracy and other drug charges.

### 7.    Evidence of Consciousness of Guilt

> Though not listed in Rule 404(b), spoilation evidence, including evidence that defendant attempted to bribe and threatened a witness, is admissible to show consciousness of guilt. . . Because spoilation evidence tends to establish consciousness of guilt without reference to the character of the spoilater, its admission does not violate Rule 404(b).  (citation omitted).

United States v. Mendez-Ortiz, 810 F.2d 76, 79 (6th Cir. 1987).

The government intends to introduce numerous episodes of flight and resistance to the police by various defendants.[5]  These episodes are first of all in furtherance of the conspiracy, and admissible without more analysis.  These episodes are also evidence of consciousness of guilt, and admissible as such against the defendants.  United States v. Green, 25 F.3d 206, 210 (3d Cir. 1994) (flight by defendant after seeing police officer who defendant knew was aware of defendant's open warrants); United States v. Pungitore, 910 F.2d 1084, 1151 (3d Cir. 1990).

### 8.    Disposal of Evidence

---

[5] The March, 2004 and October, 2004 gun arrests of Alton Coles are two examples. Jamar Campbell's May, 2005 arrest in Delaware County is another.  These episodes were recounted at the suppression hearings during the summer of 2007.

Various defendants, including Coles, attempted to dispose of evidence during the course of this case.[6]  These episodes should be admitted both as actions in furtherance of the conspiracy, and as evidence of consciousness of guilt.  See Ashcraft v. Tennessee, 327 U.S. 274, 277 (1946) ("[w]ilful concealment of material facts has always been considered as evidence of guilt."); United States v. Burrous, 147 F.3d 111, 117 (2d Cir. 1998) (throwing box of cash from window of car during arrest permitted inference of consciousness of guilt); United States v. Hackett, 638 F.2d 1179, 1186 (9th Cir. 1980) (flight, disposal of evidence permit inference of consciousness of guilt); Rivers v. United States, 270 F.2d 435, 438 (9th Cir. 1959) (dismemberment, disposal of body is evidence of consciousness of guilt in murder case).  Efforts to destroy evidence of the source of defendant's funds, in a drug case, is an act in furtherance of the conspiracy, as well as proof of consciousness of guilt.  United States v. Vogel, 132 Fed.Appx. 119, 121 (9th Cir. 2005) (not precedential).

9.    Threats to Witnesses

A variety of threats directed against witnesses have occurred through the course of this case.  Threats to witnesses are routinely introduced as conduct in furtherance of a criminal conspiracy.  See, United States v. Gibbs, 190 F.3d 188 (3d Cir. 1999);  United States v. Sherman, 440 F.3d 982, 991 (8th Cir. 2006).  As the Third Circuit put it,

> In cases where the incident offered is a part of the conspiracy alleged in the indictment, the evidence is admissible under Rule 404(b) because it is not an "other" crime. The evidence is offered as direct evidence of the fact in issue, not as circumstantial evidence requiring an inference as to the character of the accused. Such proof ... may be extremely prejudicial to the defendant but the court would have no discretion to exclude it because it is proof of the ultimate issue in the case.

---

[6] One example was Coles' instructions to Monique Pullins to throw his gun down the trash chute at the Clearview apartment during the early morning hours of August 10, 2005.

Gibbs, 190 F.3d at 217-18.

Threats to a witness are also admissible as evidence of consciousness of guilt. "Evidence of threats against witnesses is routinely admitted against criminal defendants to show consciousness of guilt." United States v. Garrison, 168 F.3d 1089, 1093 (8th Cir. 1999); see United States v. Gatto, 995 F.2d 449, 454 (3d Cir. 1993) (threatening look in courtroom admissible); United States v. Gonzalez, 603 F.2d 1272, 1273 (11th Cir. 1983) (death threats evidence of consciousness of guilt); United States v. Guerrero, 803 F.2d 783, 786 (3d Cir. 1986) (death threats evidence of consciousness of guilt); United States v. Pinto, 394 F.2d 470, 471 (3d Cir. 1967) (death threat to witness "plainly admissible because it was relevant to show consciousness of guilt.")  An effort to assassinate a police witness is admissible to prove defendant's intent to continue in the conspiracy in which he was involved.  United States v. Velazquez, 410 F.3d 1011, 1016 (8th Cir. 2005).

### 10.    Use of Nominees

Defendants Alton Coles and Timothy Baukman made extensive use of nominees, or "straws," to acquire assets, such as cars houses, apartments and cars, and firearms.  The use of such a nominee furthers the conspiracy by concealing the true nature of the source of income and the true identity of the person acquiring the assets.  Use of a nominee is also evidence of consciousness of guilt.  See United States v. Deutsch, 451 F.2d 98, 118 (2d Cir. 1971).

### 11.    Unexplained Wealth

A defendant's obvious wealth combined with the absence of any legitimate source for that wealth, is highly probative of defendant's involvement in drug trafficking.  See United States v. Adames, 59 Fed.Appx. 442, 445 (3d Cir. 2003) (not precedential); United States v.

Harper, 463 F.3d 663, 668 (7th Cir. 2006)  ("[s]udden, unexplained cash receipts are relevant to prove a conspiracy in which pecuniary gain is the usual motive"); United States v. Whittington, 455 F.3d 736, 739 (6th Cir. 2006) (recovery of cash and a cell phone from defendant, coupled with lack of employment, all admissible to prove defendant a crack dealer); United States v. Stubbs, 944 F.2d 828, 836 (11th Cir.1991); United States v. Patterson, 819 F.2d 1495, 1501 (9th Cir.1987); United States v. Grandison, 783 F.2d 1152, 1156 (4th Cir.1986); United States v. Young, 745 F.2d 733, 762-63 (2d Cir.1984).

"A defendant's access to unexplained or unaccounted for wealth is strong circumstantial evidence of involvement in illegal activity." United States v. Cooley, 131 Fed.Appx. 881, 883 (3d Cir. 2005) (not precedential).  The government does not have to demonstrate that the money is connected to a specific illegal transaction.  United States v. Jackson-Randolph, 282 F.3d 369, 379 (6th Cir. 2002).  "The touchstone of the admissibility inquiry is not the amount of money in the defendant's possession, but whether defendant's failure to account for its source tends to support the government's claim that the money was obtained through illegitimate means." United States v. Chandler, 326 F.3d 210, 215 (3d Cir. 2003). Possession of large amounts of cash with evidence of narcotics trafficking is, therefore, generally relevant and admissible. United States v. Newton, 891 F.2d 944, 948 (1st Cir. 1989).

12.    Failure to File Tax Returns

A number of defendants in this case did not file tax returns.  Evidence that a defendant did not file income tax returns is probative of the lack of a legitimate source of income.  See United States v. Trotter, 889 F.2d 153, 155 (8th Cir. 1989);  United States v. Davis, 789 F.Supp. 1130, 1132 (D.Kan. 1992).   It is also probative of the use of "illegal, rather than

legal" income.   United States v. Taylor, 239 F.3d 994, 999-1000 (9th Cir. 2001); Vogel, 132

Fed.Appx. at 121.  With proof of large amounts of income, see Chandler, supra, the lack of

income tax returns is probative of defendant's illegal source of income.

13.    False Exculpatory Statements

There are several episodes of false exculpatory statements in this case.  For

instance, James Morris, at the time of the search of 5 North Burden Hill Road on August 10,

2005, attempted to explain the half-million in cash lying around the house by claiming that the

government gave it to him.  During the course of her grand jury testimony, Thais Thompson

attempted to explain the half-million in cash by claiming that her grandfather gave it to her.

False exculpatory statements are proof of a defendant's consciousness of guilt, and evidence of

defendant's involvement in a conspiracy.  See  United States v. Isaac-Sigala, 448 F.3d 1206,

1212 (10th Cir. 2006); United States v. Ogedengbe, 188 Fed.Appx. 572, 573-574 (9th Cir. 2006);

United States v. Vannerson, 786 F.2d 221, 224 (6th Cir. 1986).

> 'fabrication . . . [by defendant] is receivable against him as an indication of his
> consciousness that his case is a weak or unfounded one; and from that consciousness may
> be inferred the fact itself of the cause's lack of truth and merit. The inference thus does
> not apply itself necessarily to any specific fact in the cause, but operates, indefinitely
> though strongly, against the whole mass of alleged facts constituting his cause.'
> II Wigmore, Evidence § 278(2).

Government of Virgin Islands v. Lovell,  378 F.2d 799, 806-807 (3d Cir. 1967); see United

States v. LBS Bank-New York, Inc., 757 F.Supp. 496, 505 (E.D.Pa. 1990) ("false exculpatory

statements made to law enforcement officials are circumstantial evidence of consciousness of

guilt and have independent probative force . . ." (citation omitted)).  Similarly, the manufacturing

of false invoices to hide drug proceeds is admissible to directly prove the conspiracy and to prove

38

consciousness of the illegality of the sources of income.    Vogel, 132 Fed.Appx. at 120.

14.    Association With Other Conspirators

While presence and association alone cannot establish a defendant's participation in a conspiracy, the jury is permitted to "consider presence and association, along with other evidence, in finding conspiratorial activity by the defendant." United States v. Chavez, 947 F.2d 742, 745 (5th Cir.1991).

United States v. Pompa, 434 F.3d 800, 806-07 (5th Cir. 2005); accord United States v. Mickelson, 378 F.3d 810, 821(8th Cir. 2004) (association, while not enough on its own to prove conspiracy, is admissible with other evidence to prove conspiracy).  Photographs of various defendants together is admissible to prove a conspiracy.  United States v. Price, 418 F.3d 771, 782 (7th Cir. 2005).  The government will introduce a information and documents seized at various locations used by conspirators that connects the conspirators together in a variety of contexts.

15.    Counter-Surveillance Activity

Defendants engaged in a significant amount of counter-surveillance activity in this case, including, for instance, unusual precautions involving the use of telephones, the use of "straws" to purchase assets and firearms, and other devices.  Evidence that a defendant has conducted counter-surveillance is admissible to prove defendant was involved in a drug conspiracy.  See Price, 418 F.3d at 779 (copy of "police alert" recovered in defendant's home admitted).

16.    Drug Sales Not Involving Defendant

Drug sales conducted during the course of a conspiracy, even when they did not involve a defendant, are admissible to prove the nature and extent of the conspiracy, because

each conspirator is liable for the acts of his co-conspirators, undertaken during and in furtherance of the conspiracy, even when he was not aware of the actions of his co-conspirators.  United States v. Johnston, 353 F.3d 617, 624 (8th Cir. 2003).

   17. Constructive Possession

   Possession of drugs or firearms need not be actual or exclusive.  "[O]wnership, dominion, or control over the contraband itself, or dominion or control over the premises in which the contraband is concealed. . ." amounts to "constructive possession."  United States v. Smith, 930 F.2d 1081, 1085 (5th Cir. 1991) (possession of firearms in house defendant co-occupied; defendant not present when guns seized) (citations omitted).

> Constructive possession exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, . . . and [it] may be proved by direct or circumstantial evidence.  It is not necessary that such evidence remove every reasonable hypothesis except that of guilt.

United States v. Rivera, 844 F.2d 916, 925 (2d Cir. 1987) (possession of firearms in house defendant co-occupied) (citations omitted).  "It is not necessary that the exercise of dominion and control by others be disproved; it is only necessary that the evidence support the jury's finding that [defendant] exercised dominion and control over the weapon."  Id., at 926.  See also, United States v. DePugh, 993 F.2d 1362, 1364 (8th Cir. 1993) (gun found in residence; defendant not present).

   Similarly, narcotics may be constructively possessed by one exercising dominion and control over a house.  United States v. Wilson, 107 F.3d 774, 779 (10th Cir. 1997) (no direct evidence that defendant owned or rented premises; letters, documents and photographs of defendant found in upstairs bedroom; drugs found in yard).  Dominion and control can be

inferred from use of a property, see Jackson v. Byrd, 105 F.3d 145, 150 (3d Cir. 1996).

        18.     Expert Narcotics Testimony

"In cases involving narcotics trafficking, courts have admitted a broad range of expert testimony concerning the 'modus operandi' of the drug trade." United States v. McGlory, 968 F.2d 309, 345 (3d Cir. 1992); see also United States v. Watson, 260 F.3d 301, 308 (3d Cir. 2001) ("[E]xpert testimony concerning the modus operandi of individuals involved in drug trafficking does not violate Rule 704(b)."). It is well established that police officers may testify as experts concerning the methods and practices employed in a particular area of criminal activity, United States v. Pungitore, 910 F.2d 1084, 1149 (3d Cir. 1990), including the operations of a drug trafficking ring, United States v. Ginsberg, 758 F.2d 823, 830 (2d Cir. 1985); United States v. Montas, 41 F.3d 775, 783-84 (1st Cir. 1994). Courts have upheld the admissibility of expert testimony by investigative agents who are properly qualified as experts regarding the "tools of the trade" for narcotics trafficking. United States v. Foster, 939 F.2d 445, 453 (7th Cir. 1991); United States v. Solis, 923 F.2d 548, 550-51 (7th Cir. 1991) (expert testimony upheld on the use of beepers in narcotics trafficking); United States v. Monu, 782 F.2d 1209, 1210-11 (4th Cir. 1986) (expert testimony upheld on the use of scales in the drug trade); United States v. Navarro, 90 F.3d 1245, 1259-60 (7th Cir. 1996). In addition, "experienced narcotics agent[s] may testify about the significance of certain conduct or methods of operation to the drug distribution business, as such testimony is often helpful in assisting the trier of fact understand the evidence." United States v. Griffith, 118 F.3d 318, 321 (5th Cir. 1997), quoting United States v. Washington, 44 F.3d 1271, 1283 (5th Cir. 1995).

        The government intends to introduce the testimony of Detective Chris Marano, an

expert in the operations of a drug trafficking organization.  The expert's testimony, in this case, is

admissible under Daubert, as he provides a reliable opinion based on years of experience.  The

district court should find that the expert possesses "areas of specialized knowledge outside the

common experience of the jury," and that he is qualified to testify as an expert "in drug

enterprises and their organization; as well as the trafficking in narcotics, including cocaine and

crack."

   This testimony, concerning a variety of aspects of drug trafficking organizations,

is, in fact, specialized knowledge which is not within the purview of the average juror.  Det.

Marano also provides detailed information about law enforcement techniques including

surveillance, monitoring of various electronic communications, and search warrants.  In addition,

his expertise, gained through hundreds of investigations concerning how narcotics traffickers

protect their turf, avoid losing the large amounts of currency they obtain, and attempt to avoid

detection by police, is not knowledge available to the average citizen or juror.  Det. Marano is

expected to testify that the circumstances surrounding the seizure of different drug and drug

paraphernalia evidence is consistent with distribution activity, and not with possession for mere

personal use.  Det. Marano is also expected to testify that the circumstances surrounding the

seizure of various firearms in this case are consistent with possession of the firearms to defend

and extend drug trafficking assets and turf.

   The government has submitted a standard instruction regarding the jury's

consideration of expert testimony, and requests that this instruction be given.

   19.  Expert Testimony Regarding Use of Phones by Drug Organization

   The government intends to introduce expert testimony by Special Agent Anthony

Tropea concerning the use of electronic communications by large drug trafficking organizations.[7]

Rule 702 of the Federal Rules of Evidence provides that

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Expert testimony from law enforcement, particularly regarding narcotics organizations, is nothing new to the courts:

> it is still a reasonable assumption that jurors are not well versed in the behavior of drug dealers. "The investigator and the expert witness both serve as a link to the drug culture in providing the jury with [an] understanding of the intricate patterns and modus operandi" of those involved in narcotics trafficking.

United States v. Foster, 939 F.2d 445, 451, 452 (7th Cir. 1991) (citation omitted). See United States v. Robertson, 387 F.3d 702, 705 (8th Cir. 2004) (experienced police narcotics expert's testimony satisfied Rule 702 and the reliability requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)); United States v. Brewer, 1 F.3d 1430, 1436 (4th Cir. 1993) (experienced narcotics investigator's testimony about the use of telephones and the significance of calling patterns satisfied Rule 702); United States v. Theodoropoulos, 866 F.2d 587, 590-91 (3d Cir. 1989) (expert testimony regarding drug jargon used by dealers). Police investigative techniques, such as latent fingerprint examination, have long been the subject of expert testimony. See United States v. Mitchell, 365 F.3d 215, 234 (3d Cir. 2004).

In Brewer, a police officer testified about the significance of various cell phones

---

[7] Agent Tropea was qualified as an expert in this field on a number of occasions during the seven trials in United States v. Carter, et al, No. 02-172. The district court's admission was tested and affirmed on appeal in United States v. Patterson, 175 Fed.Appx. 513, 518 -519 (3d Cir. 2006).

and pagers seized during the investigation, as well as a "bevy" of telephone records. Id. at 1436.

The expert described the use of cell phone and pagers by drug dealers, and opined that the

"flurry" of telephone calls surrounding the time of a particular drug transaction indicated the

"staging of a transaction." Id. The expert's testimony satisfied Rule 702 because of the

witnesses' seven years of narcotics experience. Id.

The district court has "considerable latitude" in deciding whether the various

Daubert factors, developed in the context of scientific expertise, were reasonable indicators of

reliability.[8] Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); United States v.

Allen, 269 F.3d 842, 845, 846 (7th Cir. 2001) (narcotics expert's testimony admissible under

Daubert and Kumho, based on his experience, the subject matter's unfamiliarity to the jury, and

the helpfulness of the testimony to the jury).

Additionally, the agent's preparation of summary charts, from which much of his

testimony flows, is of particular value. These charts represent focused summaries of vast

amounts of data contained in a computer database compiled from multiple sources of electronic

monitoring. The charts prepared by the expert represent queries directed to this database

concerning specific dates, times, and telephone numbers. The results of these charts will be

presented to the jury through the agent's testimony, which, in many respects, is similar to that of

a financial expert. The agent's testimony summarizes large volumes of data, which, though

relatively simple in atomized form, become overwhelming in the aggregate. See, e.g., Total

Control, Inc. v. Danaher Corp., 338 F. Supp. 2d 566, 569-70 (E.D. Pa. 2004) (testimony of

---

[8] The district court need not hold a Daubert hearing, if the defendant did not request one. United States v. Robertson, 387 F.3d 702, 705 (8th Cir. 2004) (Daubert hearing not always necessary in context of police narcotics expert).

financial expert about voluminous transactions admitted).

Agent Tropea's testimony will in large part consist of a distillation of the vast amounts of telephone data which were accumulated in this case. However, he will also offer some opinion evidence identifying certain patterns of telephone usage as consistent with drug trafficking activity. Here, the expert's long experience, the unfamiliarity of the subject matter to the average juror, and the helpfulness of the agent's testimony are all clear. Agent Tropea is expected to testify about how telephone contact data is collected from pen registers and telephone records and stored in a database, and how the information gleaned is analyzed and exploited when investigating a large drug trafficking organization. Agent Tropea is expected to supply evidence concerning defendants' use of cellular telephones, the volume, frequency and patterns of contacts between defendants, particularly surrounding major episodes, and the use of codes during drug trafficking conversations. All of this is information that is not within the common experience of the ordinary juror.[9]

### B.    Essential Elements

A chart detailing the counts applicable to each defendant in this trial is attached to this Memorandum for the convenience of the parties and the court.

To prove a violation of **Title 21, United States Code, Section 846 (count one, drug trafficking conspiracy)**, the government must prove the following:

a.    That the defendant agreed with one or more persons;
b.    To distribute a controlled substance,[10] in this case, cocaine and cocaine

---

[9] The government's standard instruction regarding the jury's consideration of expert testimony would apply to all expert testimony.

[10] Where enhanced penalties are based on the weight of narcotics, the statutory weight will be alleged and proven at trial to prevent any problems arising from the decision in Apprendi

base ("crack"), both Schedule II narcotic controlled substances; and

c.      That he or she did so knowingly.

To prove a violation of **Title 21, United States Code, Section 848(a) (count two,**

**continuing criminal enterprise)**, the government must prove beyond a reasonable doubt that

a.      The defendant's conduct must constitute a felony violation of federal narcotics law enumerated in 21 U.S.C. §§ 801-971.

b.      The conduct must take place as part of a continuing series of such violations.

c.      The defendant must undertake the activity in concert with five or more other persons,

d.      with respect to whom the defendant must occupy a position as the organizer, a supervisory position, or any other position of management;

e.      The defendant must obtain substantial income or resources from this enterprise.

Whether a defendant is a "principal administrator, organizer, or leader" of a continuing criminal enterprise under 21 U.S.C. § 848(b) is a sentencing issue, not an element of the crime defined in section 848(a). The maximum sentence authorized under 21 U.S.C. § 848(a) is life imprisonment, while the mandatory minimum sentence is 20 years. Section 848(b) creates a higher mandatory minimum, life imprisonment, based on proof of additional factors, but does not increase the maximum sentence. The only elements which need be pled in the indictment, and proven at trial beyond a reasonable doubt, are those contained in 21 U.S.C. § 848(a). Harris v. United States, 536 U.S. 545 (2002). The Third Circuit recently upheld this view in United States v. Patterson, 04-3380 (March 14, 2006).

To prove a violation of **Title 21, United States Code, Section 841(a)(1) (counts**

v. New Jersey. The jury should determine the weight of the drugs attributable to each conspirator by special interrogatory.

**40 and 62, possession with intent to distribute a controlled substance)**, the government must

prove the following elements beyond a reasonable doubt:

      a.      the defendant knowingly possessed a controlled substance[11] (cocaine and/or cocaine base ("crack"));

      b.      with the intent to transfer some or all of it to at least one other person.

To prove a violation of **Title 21, United States Code, Section 843(b) (counts 38,**

**41-48, and 50-56, use of a communication facility to facilitate drug trafficking)**, the

government must prove the following elements beyond a reasonable doubt:

      a.      the defendant knowingly used a communication facility (in this instance, telephones),

      b.      to further the commission of a drug crime.

To prove a violation of **Title 21, United States Code, Section 856(a)(2) (counts**

**49 and 61, maintaining a storage facility)**, the government must prove the following:

      1.      the defendant managed or controlled any building, room, or enclosure;

      2.      either as lessee, agent, employee, mortgagee, or occupant; and

      3.      knowingly and intentionally rented, leased, or made available for use with or without compensation the building, room, or enclosure;

      4.      for the purpose of unlawfully storing or distributing a controlled substance.

To prove a violation of **Title 18, United States Code, Section 924(c) (counts 63,**

**67, 68, 70, 72, 181-183, possession of a firearm in furtherance of a drug trafficking crime)**,

the government must prove the following:

      a.      the defendant committed a drug trafficking crime as alleged; and

---

[11] The drug weight should be decided by a jury under a special interrogatory in order to conform with the dictates of <u>Apprendi</u>.

         b.     in furtherance of that crime

         c.     he knowingly possessed a firearm.

To prove a violation of **Title 18, United States Code, Section 924(c) (count 184, using and carrying a firearm during and in relation to a drug trafficking crime)**, the government must prove the following:

         a.     the defendant committed a drug trafficking crime as alleged, and

         b.     he knowingly used or carried a firearm

         c.     during and in relation to the drug trafficking crime.

To prove a violation of **Title 18, United States Code, Section 922(g)(1) (counts 59, 60, 69, and 71, felon in possession of a firearm or ammunition),** the government must prove that:

         a.     The defendant had been convicted of a crime punishable by more than one year in prison;

         b.     The defendant knowingly possessed a firearm; and

         c.     The defendant possessed the firearm in or affecting commerce.

To prove a violation of **Title 18, United States Code, Section 1956(h) (counts 77 and 80, money laundering conspiracy)**, the government must prove beyond a reasonable doubt that

         a.     a conspiracy to launder money was entered into by two or more people;

         b.     one of the conspirators committed an overt act in furtherance of the conspiracy;

         c.     the defendant knew the purpose of the conspiracy; and

         d.     the defendant deliberately joined the conspiracy

United States v. Navarro, 145 F.3d 580, 592 (3d Cir. 1998), citing United States v. Conley, 37

F.3d 970, 976-77 (3d Cir.1994).[12]

To prove a violation of **Title 18, United States Code, Section 1956(a)(1)(A)(I)**

**(counts 89-120, money laundering to promote drug trafficking)**, the government must prove

beyond a reasonable doubt that

> a.    the defendant knowingly conducted a "financial transaction" as defined under the statute;
>
> b.    the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity;
>
> c.    the financial transaction involved the proceeds of specified unlawful activity described in 18 U.S.C. § 1956(c)(7); and
>
> d.    the defendant conducted the financial transaction with the intent to promote the carrying on of specified unlawful activity.

The term "conducts" includes initiating, concluding, or participating in initiating, or concluding a transaction.  The term "transaction" defined in 18 U.S.C. § 1956(c)(3), and includes, among other things, purchases, sales, loans, gifts, transfers, deliveries, and with respect to a financial institution includes deposits, withdrawals, transfers between accounts, exchanges of currency, loans, and any other payment, transfer, or delivery by, through or to a financial institution, by whatever means effected.

The term "financial transaction" means: (A) a transaction that in any way or degree affects interstate commerce, and that involves: (I) the movement of funds by wire or other means; or (ii) one or more monetary instruments; or (iii) the transfer of title to any real property, vehicle, vessel, or aircraft; or (B) a transaction involving the use of a financial institution that is engaged in, or the activities of which affect, interstate commerce in any

---

[12] There is a circuit split on the issue of whether an overt act is required under § 1956, see United States v. Evans, 272 F.3d 1069, 1082 (8th Cir .2001); United States v. Wilson, 249 F.3d 366, 379 (5th Cir.2001); United States v. Ross, 190 F.3d 446, 450 (6th Cir. 1999); United States v. Hildebrand, 152 F.3d 756, 762 (8th Cir. 1998); and Navarro (all requiring overt act) with United States v. Godwin, 272 F.3d 659, 669 n. 9 (4th Cir.2001); United States v. Tam, 240 F.3d 797, 802 (9th Cir.2001) (not requiring overt act by analogy to 21 U.S.C. § 846).   The government has alleged overt acts and does not wish to be a test case on this point.

way or degree.

"Interstate commerce" means commerce or travel between the states, territories or possessions of the United States, including the District of Columbia. It is not necessary that the defendant have intended or anticipated an effect on interstate commerce. All that is necessary is that the natural and probable consequence of the acts the defendant took did in fact affect interstate commerce, however minimal that effect is.

"Proceeds" can be any kind of property, not just money.

To prove a violation of **Title 18, United States Code, Section 1956 (a)(1)(B)(I) (counts 78, 79, and 121-175, money laundering to conceal the nature, source, ownership and control of funds)**, the government must prove beyond a reasonable doubt that

    a.    the defendant knowingly conducted, or attempted to conduct, a "financial transaction," defined below;

    b.    the defendant knew that the funds or property involved in the financial transaction represented the proceeds of some form of unlawful activity;

    c.    the funds or property involved in the financial transaction did in fact represent the proceeds of "specified unlawful activity"--in this case the proceeds of a drug conspiracy and continuing criminal enterprise; and

    d.    the defendant engaged in the financial transaction knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or the control of the proceeds of such specified unlawful activity.

To prove a violation of **Title 31, United States Code, Section 5324(a)(3) (counts 81-86, structuring),** the government must prove beyond a reasonable doubt that:

    a.    the defendant knowingly structured a currency transaction;

    b.    the defendant knew of the domestic financial institution's legal obligation to report transactions in excess of $10,000; and

    c.    the purpose of the structured transaction was to evade that reporting obligation.

A person structures a transaction if that person, acting alone or with others, conducts one or more currency transactions in any amount, at one or more financial institutions, on one

or more days, for the purpose of evading the reporting requirements described earlier. Structuring includes breaking down a single sum of currency exceeding $10,000 into smaller sums, or conducting a series of currency transactions, including transactions at or below $10,000. Illegal structuring can exist even if no transaction exceeded $10,000 at any single financial institution on any single day.

It is not necessary for the government to prove that a defendant knew that structuring a transaction to avoid triggering the filing requirements was itself illegal. The government need prove beyond a reasonable doubt only that a defendant structured currency transactions with knowledge of the reporting requirements and with the specific intent to avoid said reporting requirements.  Pattern Jury Instructions: Fifth Circuit, Criminal Cases, § 2.99 (2001).

To prove a violation of **Title 18, United States Code, Section 1343 (counts 87 and 88, wire fraud on a financial institution),** the government must prove beyond a reasonable doubt that

1. Defendant knowingly devised or participated in a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises;

2. The defendant acted with the specific intent to defraud;

3. The fraud affected a financial institution; and

4. In advancing, furthering, or carrying out the scheme, the defendant caused to be transmitted by means of wire in interstate commerce writings, signs and signals.

See 2 Devitt and Blackmar, Federal Jury Practice and Instructions, § 40.03 (4th ed. 1990); see also United States v. Pharis, 298 F.3d 228, 234 (3d Cir. 2002); United States v. Frey, 42 F.3d 795, 797 (3d Cir. 1994); United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994); United States v. Copple, 24 F.2d 535, 544 (3d Cir. 1994); United States v. Pearlstein, 576 F.2d 531, 534 (3d Cir. 1978); accord Pereira v. United States, 347 U.S. 1, 8-9 (1954).

To prove a violation of **Title 26, United States Code, Section 5861(d) (count**

**187, unlicensed possession of machine gun),** the government must prove beyond a reasonable doubt the following elements:

1. Defendant knowingly possessed a "machinegun"

2. Which is not registered to him in the National Firearms Registration and Transfer Record.

To prove a violation of **Title 21, United States Code, Section 854 (count 176, investment of drug proceeds in enterprise in interstate commerce),** the government must prove beyond a reasonable doubt that

1. defendant received income derived from the drug trafficking crime alleged,

2. in which defendant participated as a principal,

3. defendant invested some part of the income, or the proceeds of such income,

4. in the acquisition, establishment or operation of

5. an enterprise which is engaged in, or the activities of which affect, interstate commerce.

To prove a violation of **Title 18, United States Code, Section 3 (count 192, accessory after the fact),** the government must prove beyond a reasonable doubt that

1. The crime of conspiracy to distribute and possess with intent to distribute cocaine and cocaine base had been committed by James Morris;

2. defendant knew that this crime had been committed and that James Morris had committed it; and

3. defendant thereafter intentionally received, relieved, comforted, or assisted James Morris in order to hinder and prevent that person's apprehension, trial, or punishment for the crime of conspiracy to distribute and possess with intent to distribute cocaine and cocaine base.

The crime of has conspiracy to distribute and possess with intent to distribute cocaine and cocaine base has essential elements which have been previously explained to you.

To prove a violation of **Title 18, United States Code, Section 1623 (counts 189-191, materially false statements under oath) ,** the government must prove beyond a reasonable doubt that

1.    Defendant gave testimony under oath before a federal court;

2.    Defendant testified that as detailed in the indictment;

3.    This testimony was false;

4.    Defendant knew that the testimony was false when she gave the testimony; and

5.    The false statement was material.

Testimony before a federal grand jury is matter before a federal court.

To prove a violation of **Title 18, United States Code, Section 2 (aiding and abetting),** the government must prove beyond a reasonable doubt that

1.    Knew that the crime charged was to be committed or was being committed,

2.    Knowingly did some act for the purpose of aiding, commanding or encouraging the commission of that crime, or willfully caused someone to commit the crime of wire fraud (counts one and two) or mail fraud (counts three and four), and

3.    Acted with the intention of causing the crime charged to be committed.

Before a defendant may be found guilty as an aider or an abettor to the crime, the

53

government must also prove, beyond a reasonable doubt, that someone committed each of the essential elements of the offense charged as detailed for you, as to counts one through four.

Merely being present at the scene of the crime or merely knowing that a crime is being committed or is about to be committed is not sufficient conduct for the jury to find that a defendant aided and abetted the commission of that crime.

The government must prove that a defendant knowingly and deliberately associated himselfwith the crime in some way as a participant – someone who wanted the crime to be committed – not as a mere spectator.

### C.    Motion In Limine

#### 1.    Admission of Portions of Video

The government moves in limine for the admission at trial of portions of a video, New Jack City: The Next Generation, that was produced by "Ace Capone" and "Tim Gotti," defendants Coles and Baukman, and their business Take Down Records.  Coles and Baukman also have starring roles in this video.  The "story line" of the video is that Coles, with the assistance of his top lieutenant Baukman, sold drugs in and around Philadelphia for a source known as "the King."  In one scene that the government requests to play at trial, Coles convenes a meeting of his associates, including defendant Baukman and certain unindicted conspirators,[13] to tell them that he intends to switch from selling powder cocaine to crack cocaine, and suggests that he will no longer be using the King as a source of drugs.  Coles explains to the group that he has a "Texas connect," and that Baukman will be in charge of the "daily operation" and will make sure that the "coke is cooked right."  Coles also states that he wants the group to sell his crack cocaine to the following areas:  North Philadelphia, South Philadelphia, West Philadelphia,

---

[13]  Among those who are present in the scene are various "rappers" the defendant is likely to claim were a part of his business, Take Down Records.  Witnesses will testify that these "rappers" were drug dealers for Coles.

Germantown, Delaware, Chester, and Camden.

This scene from the video is admissible as direct evidence of the conspiracy charged in the indictment and Coles's and Baukman's role in it. The jury will hear during trial that Coles ran a multi-state cocaine and crack cocaine drug gang, and that, in fact, he sold his product in each of the areas he describes in the video. The jury also will hear that Coles had a source of supply of cocaine from Texas – a Texas connect – and that Coles relied on Baukman to cook powder cocaine to crack. In fact, during one call that agents intercepted during the Title III monitoring of Coles's two phones, Coles is heard asking Baukman to teach another conspirator, Donte Tucker, to cook large amounts of powder cocaine to crack cocaine. The evidence at trial will show, further, that Baukman was in reality Coles's top lieutenant, just as he was portrayed in the video. Thus, the video was really art imitating life, and serves as an admission by Coles and Baukman of the conspiracy that they led from 1997 to 2005.

The Third Circuit has held that "Rule 404(b), which proscribes the admission of evidence of other crimes when offered to prove bad character, does not apply to evidence of uncharged offenses committed by a defendant when those acts are intrinsic to the proof of the charged offense." United States v. Gibbs, 190 F.3d 188, 217 (3d Cir. 1999) (holding that defendant's participation in uncharged acts of violence was admissible as direct proof of the conspiracy with which he was charged). In United States v. Cross, 308 F.3d 308 (3d Cir. 2002), the Third Circuit explained that "acts are intrinsic when they directly prove the charged [crime]." Id. at 320. Thus, this scene from the video, as well as the others discussed infra, directly prove the charged conspiracy and are not subject to an analysis under 404(b).

Nevertheless, this evidence is admissible even under Rule 404(b) in order to prove

Coles's and Baukman's knowledge and intent of the drug-trafficking world they inhabited for eight years.  In fact, the video is akin to rap lyrics in which an artist discusses drugs and guns. Admission of rap lyrics, in fact, has been considered to be

> the equivalent of admitting *The Godfather* to illustrate Puzo's knowledge of the inner workings of an organized crime family . . . Rap music . . . "constitutes a popular musical style that describes urban life"; it describes the reality around its author.  And it is [defendant's] knowledge of this reality, as evidenced by the verse that he has admittedly authored, that was relevant to the crimes for which he was charged . . .

United States v. Foster, 939 F.2d 445, 456 (7th Cir.1991).  Tellingly, the Seventh Circuit in Foster rejected the defendant's argument that his rap lyrics have "artistic value;" that they are fiction and, as such, cannot be relevant to his guilt.  The court, instead, held that the evidence was admissible under Rule 404(b), and, in doing so, stated that "in writing about this 'fictional' character, Foster exhibited knowledge of an activity that is far from fictional.  He exhibited some knowledge of narcotics trafficking, and in particular drug code words. It was for this limited purpose that the verse was admitted, and it is for this limited purpose that its relevance is clear." Id. at 456.  The government seeks to admit this scene in evidence for a similar purpose.

In another autobiographical scene from the video, Baukman and others are seen cooking what looks like powder cocaine into crack cocaine, and bagging the crack cocaine for sale on the streets.  The government will show this scene not to prove that the cocaine and crack cocaine were real (they likely were not), but because, as with the previous scene, it demonstrates a knowledge of how to cook cocaine, and how to bag it for street-level sales.  Coles's and Baukman's knowledge of these activities – including use of a Pyrex pot and baking soda during the cooking process – is, of course, another central issue in the case and not so common that a

layman would know how to perform them.

In a third scene from the video, Coles, coconspirator Jamar Cambell, and others are sitting around a table while cleaning and loading their firearms in anticipation of executing the King. Again, the government does not intend to argue that this scene proves that Coles, Campbell, and others actually killed someone. Rather, possession of, and knowledge of the use of, guns is obviously another central issue in this case. The evidence at trial will be that certain firearms that are visible during that scene were actual firearms and not merely "props." This scene demonstrates that Coles and his coconspirators were intimately familiar with guns, knew how to use them and, indeed, had access to them. Guns are an acknowledged "tool of the trade" in the drug business. Possession of weapons, in particular handguns, along with other evidence, is powerful circumstantial evidence that an individual is in the drug trafficking trade. United States v. Price, 418 F.3d 771, 779 (7th Cir. 2005); United States v. Adams, 759 F.2d 1099, 1108 (3d Cir.1983) (admission of Uzi type weapons during narcotics trial not unduly prejudicial; guns are "tools of the trade.")

In a fourth scene, Coles, Campbell, and others are about to kill the King. At the moment that the assassins, including Coles and Campbell, are standing over their wounded rival, they pull out their guns. Agents will be able to testify that the gun that Campbell is holding at this moment is the same gun that they recovered from his home when they arrested him in this case. They also will be able to testify that the gun is not a "prop," but an operational firearm loaded with an extended clip. This evidence is powerful evidence of Campbell's possession of this firearm. It is also evidence proving that the defendants had access to firearms, which they used in furtherance of their conspiracy. See supra. This evidence is further helpful to prove to

the jury that Coles and Baukman were not merely "artists" or "producers," but large-scale drug

traffickers who constantly intermingled their legitimate ventures with their drug trafficking

crimes, and their legitimate proceeds with drug trafficking proceeds.

Last, in another scene, one of Coles's "rappers," Anwar Berryman, also known as

"Bugsy," is holding the same weapon that Campbell was holding in the earlier scene.  Although

Berryman may have performed a few songs on behalf of Take Down Records and Coles and

Baukman, the evidence at trial will be that he "performed" as a drug dealer, as well.  His holding

an operational firearm, rather than a toy, in the video, is additional proof that his label as an

"artist" for Take Down was a veneer used to mask Take Down's drug-related nature.  See supra.

Each of these scenes also is admissible as proof of the coconspirators' association

with each other.  See United States v. Pompa, 434 F.3d 800, 806-07 (5th Cir. 2005) ("presence

and association" with other drug traffickers, along with other evidence, can prove conspiracy);

United States v. Mickelson, 378 F.3d 810, 821(8th Cir. 2004) (association, while not enough on

its own to prove conspiracy, is admissible with other evidence to prove conspiracy).  Photographs

of various defendants together is admissible to prove a conspiracy.  United States v. Price, 418

F.3d 771, 782 (7th Cir. 2005).  That Coles, Baukman, Campbell, and unindicted coconspirator

Berryman appear together in this video is additional proof, when taken with the evidence of their

drug trafficking activities, of the conspiracy charged in the indictment and should be admitted for

this purpose, in addition to those stated above.

> 2.     Admission of August 10, 2005 Statements of Defendants Morris
>         and Thompson Against Each Other

On August 10, 2005, federal agents searched defendants Thompson's and Morris'

home at 5 Burden Hill Road, Quinton, New Jersey.  They recovered approximately $559,000 in cash that had been scattered throughout the house.  At the conclusion of the search, DEA Agent Kim Thompson provided defendant Thompson with a list of the items that were seized from the property, which included the half-million in cash.  Defendant Thompson reviewed the list with Agent Thompson.  The only thing on the list that Defendant Thompson claimed was hers was the firearm, which had been recovered from defendant Thompson's purse.  Defendant Thompson later testified in the federal grand jury that the money belonged to her, and that it was left to her by her now-deceased grandfather, who had been a boilermaker.  In addition, as agents were preparing to leave the property on August 10, 2005, defendant Morris asked them if he could have "my money back."

Each defendant's statement is admissible against the particular speaker, and is not barred from trial under Bruton v. United States, 391 U.S. 123 (1968).  Bruton bars admission at a joint trial of a co-defendant's statement that is "powerfully incriminating" to the defendant.  Id. at 135- 36.  In that two-defendant case, the government introduced a co-defendant's confession, which stated that both the declarant and Bruton committed a robbery together.  The Supreme Court held that admission of this express statement violated Bruton's Sixth Amendment right to cross-examine witnesses because the statements were so powerfully incriminating that limiting instructions would be ineffective.

The Court re-visited this issue in Richardson v. Marsh, 481 U.S. 200 (1987).  There, the government redacted a co-defendant's confession to omit all reference to the defendant.  In the context of other trial evidence, however, the statement could have helped the jury conclude that Marsh was a participant in the crime.  The Supreme Court rejected Marsh's

challenge to the introduction of this statement and refused to extend <u>Bruton</u> to this situation.

Unlike the confession in <u>Bruton</u>, which "expressly implicat[ed]" the defendant, the statement in

<u>Richardson</u> "was not incriminating on its face, and became so only when linked" with other

evidence.  <u>Id.</u> at 208.  The Court held that <u>Bruton</u> only prohibits the use of statements that

"clearly inculpate" the defendant or are "powerfully incriminating" on their face.  <u>Id.</u> at 207.

In other words, to invoke <u>Bruton</u>, the statement in question must directly, rather than indirectly,

implicate the complaining defendant.  If the co-defendant's out-of-court statement does not

clearly and directly implicate the defendant, then "the <u>Bruton</u> rule does not come into play."

<u>United States v. Belle</u>, 593 F.2d 487, 493 (3d Cir. 1979) (en banc).

Defendant Morris may argue that defendant Thompson's statement to the agent, in

which she implicitly disavowed any ownership of the cash, would inculpate him at trial and,

therefore, raises <u>Bruton</u> concerns.  This argument, if made, would fail.  Defendant Thompson's

statement did not directly implicate defendant Morris.  If anything, her statement merely

indirectly implicates him in the context of other trial evidence, which, as noted above, does not

present a <u>Bruton</u> problem.  In other words, defendant Thompson did not tell the agent that the

money was Morris'.  She simply claimed that only the gun on the list belonged to her.  Such an

indirect relationship between Thompson's statement and Morris's culpability is too attenuated to

raise a constitutional issue.  Moreover, Thompson's statement is, if anything, inculpatory against

Thompson herself, since she later testified in the grand jury that the money belonged to her.  Her

prior statement to the agent tends to prove that she committed perjury in the grand jury as to that

testimony, which is one of the charges against her in the fifth superseding indictment.  Therefore,

Thompson's statement should be admissible in her joint trial with Morris.

Indeed, in United States v. Rubio, 709 F.2d 146 (2d Cir. 1983), Rubio and her husband, co-defendant Rosado, were charged in a narcotics conspiracy. Id. at 148. They were arrested in a hotel where they had arranged to meet with an undercover agent and an informant, whom they believed would sell them cocaine. Id. Upon her arrest, Rubio was carrying a triple beam scale, a device often used by drug traffickers to weigh cocaine, and a bottle of bleach, often used to test cocaine. Id. In his post-arrest statements, Rosado told the agents that he was at the hotel for a weekend vacation with his wife, and that his wife brought the scale and bleach with her because she "was planning to do some cooking and cleaning over the weekend at the hotel." Id. Rubio contended that admission of her husband's statements at trial through the testimony of an agent violated Bruton because she did not have the opportunity to cross-examine her husband, who did not testify. Id. at 154. The Second Circuit disagreed, finding Rubio's Bruton argument meritless. Id. "Rosado's statements clearly were not inculpatory as to Rubio." Id. at 155. Moreover, "nothing new or incriminating was presented to the jury which had not already been presented," such as the fact that Rubio had been arrested at the hotel and had acknowledged having the scale and the bleach in her possession. Id. In addition, at the time the agent's testimony was introduced and again during the final charge to the jury, the district court properly instructed the jury to "consider such statements only with respect to Rosado and to disregard them as to Rubio." Id. at 154

Unlike in Rubio, defendant Thompson never even made a statement to the agent that Morris possessed the cash. Instead, she merely said that only the gun was hers. While other evidence in the case, including Morris's own statement, will prove that the money was indeed Morris's, this is the type of conceptional implication that Richardson found to be insufficient to

61

violate Bruton.  Accordingly, Morris cannot show any prejudice arising under Bruton, where Bruton is not implicated and where the jury is properly instructed to compartmentalize the evidence, and to use it only against defendant Thompson, as it relates to her subsequent grand jury testimony, where she claimed that the money was hers.

Similarly, defendant Thompson does not have a valid complaint against the admissibility of Morris's statement at a joint trial.  First, Morris's statement is a non-hearsay statement of a coconspirator in furtherance of a conspiracy, pursuant to Rule 801(d)(2)(E). Morris, Coles's source of cocaine, wanted to have his $559,000 back in order to continue his drug dealing business.  Only Coles was arrested on August 10, 2005, the day of the search.  None of the other coconspirators were arrested that day, and, in fact, continued to sell their drugs until they were arrested after subsequent superseding indictments were returned.  Morris's request to have his cash back was an effort to further the conspiracy, particularly since Morris was not aware that Coles had been arrested a few hours earlier.  In this instance, of course, no limiting instruction is necessary, since the statement is in furtherance of the conspiracy as charged in the indictment.

Further, Morris' statement is admissible against him as a non-hearsay admission by a party-opponent, pursuant to Rule 801(d)(2)(A).  Clearly, Morris's request to have "my money" back is an admission that the money was, indeed, his.  Thompson, however, may argue that Morris' statement presents a Bruton problem as to her.  This, too, is incorrect.  The statement does not directly implicate Thompson.  Instead, through other evidence that will be admitted in the trial, Morris' statement will indirectly implicate Thompson, because a jury may infer that Thompson's subsequent grand jury testimony - that the money was hers - was a lie.  As explained

above, the Marsh Court held that such an indirect implication does not present a Bruton concern.

Accordingly, Morris's statement is admissible at trial against Thais Thompson.

>               3.      Admission of Asya Richardson's Affidavit Against Her Alone, to
>                       Establish Her State of Mind

In November 2003, defendant Aysa Richardson completed and signed an affidavit

in support of a restraining order against her boyfriend, defendant Alton Coles. In this affidavit,

Richardson stated that Coles is a "big time drug dealer." The government hereby moves in

limine to introduce this affidavit in evidence against Richardson during the trial.

Richardson and Coles are charged in Count 79 with money laundering, in

violation of 18 U.S.C. § 1956(a)(1)(B)(i) (the conceal prong), and in Count 80 with conspiracy to

commit money laundering, in violation of 18 U.S.C. § 1956(h). These charges flow from

Richardson's and Coles's use of drug proceeds to purchase Coles's new home in Mullica Hill,

New Jersey, for approximately $466,690 in the summer of 2005, in an effort to conceal or

disguise the true nature of the funds. As the Court is aware, one of the elements of money

laundering is that the defendants were aware that the funds being laundered were proceeds of a

specified unlawful activity–in this case, drug proceeds. Accordingly, defendant Richardson's

knowledge of the source of the funds used to purchase the home is a critical element of the crime

with which she is charged. It is for this reason–and this reason alone–that the government would

like to introduce Richardson's affidavit in evidence. It tends to prove that she was aware that

Coles was a drug dealer and, therefore, that his source of income was drug proceeds. It further

tends to prove that she was aware that the money Coles was using to buy the home in Mullica

Hill was drug money. In other words, the government does not intend to argue that Richardson's

statement is proof that Coles was a "big time drug dealer," or, for that matter, a drug dealer of any stature. Instead, her statement is admissible against her alone, as it relates to her state of mind and knowledge of the source of money used to buy the house. A limiting instruction from the Court will make this clear to the jury.

To the extent that Coles would argue that this statement is inadmissible under Bruton, such an argument would fail because the statement would not be offered for the truth of the matter asserted. In Tennessee v. Street, 471 U.S. 409, 414-15 (1985) the Supreme Court held that a statement by a non-testifying co-defendant that implicated another defendant was admissible because it was not offered for the truth of the matter asserted. The Court then noted that jurors are presumed to follow instructions given by the trial court, even where the Confrontation Clause of the Sixth Amendment is at stake. See id. at 415, citing Frazier v. Cupp, 394 U.S. 731 (1969). The Supreme Court reaffirmed its holding in Street in Crawford v. Washington, 541 U.S. 36, 59 (2004) ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted (citing Street)). The Third Circuit reiterated the continuing vitality of Street's holding in United States v. Trala, 386 F.3d 536, 544 (3d Cir. 2004) (vacated on other grounds) (Crawford does not apply where truth of the out-of-court statement, and hence its reliability, is not at issue, citing Street). Other Courts of Appeal have reaffirmed the rule of Street. See Furr v. Brady, 440 F.3d 34, 40 (1st Cir. 2006) ("In general, nonhearsay statements or statements not offered for the truth of the matter asserted do not raise Confrontation Clause concerns." United States v. Trenkler, 61 F.3d 45, 62 (1st Cir.1995)).

As in Street, there is no way in which the government could redact Richardson's

statement to reduce the risk of jury misuse "'without detracting from the alleged purpose for which the confession was introduced." Id. (citations omitted).  Indeed, the entire purpose of the affidavit is to prove that Richardson knew that Coles made his money by selling drugs and knew that Coles used this drug money to buy the home.  Richardson's affidavit is highly probative non-hearsay evidence of Richardson's knowledge and intent, which is an essential element of the money laundering charges against her.  Accordingly, the government respectfully moves in limine for its admission at trial solely as to defendant Richardson, together with a limiting instruction from the Court as to its purpose.[14]

4.    Use of Organizational Chart During Opening

The government respectfully requests the ability to use an organizational chart during its opening statement to the jury.  This chart would depict the six defendants at trial, as well as many other indicted and unindicted coconspirators, and their respective roles in the conspiracy charged in the fifth superseding indictment in this case.  During a conference in chambers on December 11, 2007, defense counsel collectively opposed this suggestion.  Their opposition notwithstanding, courts have discretion to allow the use of summary charts as "pedagogical devices" to aid the jury in complex cases.  Indeed, in United States v. DePeri, 778 F.2d 963 (3d Cir. 1985), the Third Circuit recognized the usefulness of an organizational chart in

---

[14]  As an alternative, the Court may order that the jury consider Richardson's guilt or innocence on Counts 79 and 80 in a bifurcated trial, as the Court previously ordered with respect to the § 922(g)(1) counts in which Coles is named.  The government would introduce the affidavit in the bifurcated hearing, much in the way it typically introduces evidence of prior convictions in a § 922(g)(1) bifurcated hearing.  In this way, the jury already will have deliberated on Coles's guilt or innocence on the drug and money laundering charges without having heard of the affidavit, and will then have both the affidavit and the evidence previously introduced at the main hearing before it when deliberating on Richardson's guilt or innocence as to counts 79 and 80.

a case like this one:

> [Defendant] maintains that the use of a chart by the government in its opening statement deprived him of his right to a fair trial. He suggests that the chart linked him to the conspiracy before evidence concerning the conspiracy had been introduced. We disagree.
>
> The opening statement is not evidence in itself, but serves "to give the jury the broad outlines of the case to enable the jury to comprehend it." Government of the Virgin Islands v. Turner, 409 F.2d 102, 103 (3d Cir.1969). As long as the opening statement avoids references to matters that cannot be proved or would be inadmissible, there can be no error, much less prejudicial error. See Maxworthy v. Horn Electric Service, Inc., 452 F.2d 1141, 1143-44 (4th Cir.1972). To begin, we take notice that such charts are often employed in complex conspiracy cases to provide the jury with an outline of what the government will attempt to prove. The chart complained of in the instant case contained the names of the participants in the protection scheme, including the defendants, the dates they served in the Philadelphia Police Department, and the divisions in which they served. . . . [T]he court permitted the use of the chart as a demonstrative aid to help the jury remember the names and positions of the defendants. We hold that the court did not abuse its discretion in allowing the government to use a visual aid in its opening statement. The use of a chart to preview the government's case certainly did not "poison the jury's mind" against the defendants, nor did it allude to "items of highly questionable evidence." Turner, 409 F.2d at 103.

Id. at 978-79 (emphasis added).

Permitting the government to use a chart during the opening in this case–involving, in part, an eight-year long, complex, interstate drug conspiracy with over 20 participants, each with a different role–clearly would be helpful to a jury in understanding the broad outline of the government's case. Indeed, during the two-month trial, the jury will be expected to remember and compartmentalize a blizzard of evidence presented by the government. Use of the chart during opening statement will assist the jury in this process by providing them with the ability to visualize the organization and each member's role, and, therefore, understand the evidence more clearly. In short, use of the chart will help the jury

perform its role in the trial more effectively and efficiently.

Further, the government has every reason to expect that proof of the conspiracy as outlined on the chart will be forthcoming during the subsequent testimony and presentation of evidence. The conspiracy, in short, is the principal charge in the case. If the proof were lacking at trial, the government's use of a chart in its opening would be the least of its concerns. At any rate, "[s]ince 'a criminal trial does not unfold like a play with actors following a script,' [one] cannot expect the actual testimony to mimic the opening statement verbatim." United States v. Jordan, 810 F.2d 262, 265 (D.C. Cir. 1987) (quoting Geders v. United States, 425 U.S. 80, 86 (1976)).

For these reasons, the government asks the Court to permit it to show an organizational chart to the jury during opening statement.

## III.    BIFURCATION

Defendant Coles is charged with several violations of 18 U.S.C. § 922(g)(1), possession of firearms after having been convicted of a crime punishable by more than one year's imprisonment. The court has previously ruled that jury consideration of these counts will be bifurcated from the main trial. In addition, there are forfeiture issues to be decided by the jury that are normally bifurcated. Procedurally, the government recommends that the jury be advised at the time they are instructed in the main trial that after their verdict there may be certain other matters they will be asked to consider, as well, so the bifurcated proceeding does not come as a painful shock after the jury has rendered a verdict.

## IV.    JURY INSTRUCTIONS

The government will submit proposed jury instructions and verdict forms and requests that the court give these instructions and verdict forms to the jury.

Respectfully submitted,

PATRICK L. MEEHAN
*United States Attorney*


 s/Richard A. Lloret
RICHARD A. LLORET
*Assistant United States Attorney*


 s/Michael J. Bresnick
MICHAEL J. BRESNICK
*Assistant United States Attorney*

# CERTIFICATE OF SERVICE

I certify that the foregoing was served by regular mail, fax or email on the following counsel on the date indicated below:

Christopher D. Warren
1500 Walnut Avenue
Suite 1500
Philadelphia, PA 19102
Ph: (215) 546-3750
Fax: (215) 546-8779
email: Christopherduffwarren@hotmail.com
Counsel for Alton Coles (1)

Jack McMahon
1500 Walnut Street
Suite 900
Philadelphia, PA 19102
Fax: (215) 985-4416
Phone: (215) 985-4443
Email: mcmahonlaw.@hotmail.com
Counsel for Timothy Baukman (8)

Laurence Harmelin
300 N. Pottstown Pike
Suite 210
Exton, PA 19341
Tel: (610) 696 2226
Fax: (610) 696-2226
Counsel for Monique Pullins (12)

Ronald B. Thompson, Esq.
3002 Lincoln Drive, Suite J
Marlton, NJ 08053
Phone: (856) 797-5785
Fax: (856) 797-5786
Fax: (856) 597-4200
Email: ronaldbthompson@lawyer.com
Co-Counsel for James Morris (13)

Wayne Powell, Esq.
811 Church Road
101 Tarragon Building
Cherry Hill, NJ 08002
Phone: (856) 488-0004
Fax: (856) 486-7244
Co-Counsel for James Morris (13)

Ronald A. Smith
1617 JFK Blvd.
Suite 1240
Philadelphia, PA 19103
Tel: (215) 567-1200
Email: ronaldasmithesq@aol.com
Counsel for Asya Richardson (18)

Paul J. Hetznecker, Esq.
Hetznecker & Meehan
1420 Walnut Street, Suite 911
Philadelphia, PA 19102
Phone: 215-893-9640
Fax: 215-893-0255
Counsel for Thais Y. Thompson (22)

 s/Richard A. Lloret
RICHARD A. LLORET
Assistant United States Attorney
December  18, 2007

**U.S. v. Alton Coles, et al**
**Fifth Superseding Indictment**

| NAME | 846 | 848 | 841 | 843 | 854 | 856(a)(2) | 924(c) | 922(h) | 1623 | 5861(d) | 922(g) | 1956(h) | 1956(a)(1)(A)(i) | 1956(a)(1)(B)(i) | 1343 | 5324(a)(3) | 3 | 2 | 853 | 924(d) | 982 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Coles | 1 | 2 | 40, 62 | 38, 41-48, 50-56 | 176 | 49, 61 | 68, 70, 72, 181-184 | | | | 59, 60, 69, 71 | 77, 80 | | 78, 79 | 87-88 | 81-86 | | x | x | x | x |
| Baukman | 1 | 2 | 62 | | | 61 | 63, 68, 183, 184 | | | 187 | | | 89-120 | 121-175 | | | | x | x | x | x |
| Pullins | 1 | | | 46-48 | | 49 | 70 | | | | | | | | | | | x | x | x | |
| Morris | 1 | | | 52-55 | | | 67 | | | | | | | | | | | x | x | x | |
| Richardson | | | | | | | | | | | | 80 | | 79 | 87-88 | | | x | | | x |
| Thompson | | | | | | | 67 | | 189-191 | | | | | | | | 192 | x | x | x | |